**Case No. 21-1741**

In the
# United States Court of Appeals
## for the Sixth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

V.

ZACHARY KENNEDY,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of Michigan, Southern Division
No. 1:21-cr-00037 (Maloney, J.)

## PRINCIPAL BRIEF OF DEFENDANT-APPELLANT ZACHARY KENNEDY

DEBORAH A. SOLOVE
P.O. BOX 2403
WESTERVILLE, OH 43086
(614) 371-3983
dsolove@wowway.com
Counsel for Defendant-Appellant
Zachary Kennedy

# TABLE OF CONTENTS

Page No.

Table of Authorities.................................................................. iii

Statement Regarding Oral Argument ..................................... vii

Statement of Jurisdiction ..........................................................1

Issues Presented .........................................................................2

Statement of the Case................................................................2

  A.  Introduction ......................................................................2
  B.  The Guidelines Computation and Objections ...................3
  C.  The Dangerous Weapon Enhancement .............................5
  D.  The "Read and Discuss" Requirement ............................14
  E.  The Objection to The 10:1 Ice to Meth Ratio ..................19

 Summary of the Argument.......................................................20

Argument ..................................................................................22

I.  The District Court Erred In Assessing A Two-Level
   Enhancement For Possession Of A Firearm.......................22

  A.  Standard of Review .......................................................22
  B.  The Issue Here Is Unique...............................................23
  C.  The Government Failed To Show By A Preponderance Of
     The Evidence That Mr. Kennedy Possessed A Dangerous
     Weapon During Relevant Conduct..................................30

II. The District Court Failed To Confirm That Kennedy And Counsel
   Had Read and Discussed The Presentence Report ............40

  A.  Standard of Review .......................................................40

i

    B.  The Record Does Not Reflect That Kennedy And His Counsel Read And Discussed The Final Report ...........................................40

III. The Guidelines' 10:1 Ice To Meth Ratio Should Be Disregarded .....48

Conclusion ...................................................................................51

Certificate of Compliance ...........................................................52

Designation of Relevant District Court Documents...............................53

Certificate of Service ..................................................................54

# TABLE OF AUTHORITIES

**Cases**                                                                **Page No.**

*Arizona v. Fulminante*, 499 U.S. 279 (1991) ...........................................43

*Gall v. United States,* 552 U.S. 38 (2007)......................................... 22, 23

*Greer v. United States*, 141 S.Ct. 2090 (2021) ......................................43

*John B. v. Goetz*, 879 F. Supp. 2d 787 (M.D. Tenn. 2010) ......................39

*Kimbrough v. United States,* 552 U.S. 85 (2007).....................................49

*Neder v. United States*, 527 U.S. 1 (1999) ................................................42

*Spears v. United States*, 555 U.S. 261 (2009) ..........................................49

*Stinson v. United States,* 508 U.S. 36 (1993) ...........................................32

*United States v. Barron*, 940 F.3d 903 (6th Cir. 2019) ...........................25

*United States v. Brown,* No. 1:20-cr-02 (W.D. Mich. 2020) ...................46

*United States v. Burleson,* 419 Fed. Appx. 649 (2011).................... 41, 43

*United States v. Castillo-Nava*, 347 F.Supp. 3d 743(D.N.M. 2018) . 35, 36

*United States v. Catalan,* 499 F.3d 604 (6th Cir. 2007)................... 26, 31

*United States v. Cochran,* 14 F.3d 1128 (6th Cir. 1994) .................. 25, 26

*United States v. Coleman,* No. 1:21-cr-83 (W.D. Mich. 2021)..... 12, 13, 29

*United States v. Cruse,* 59 Fed. Appx. 72 (6th Cir. 2003) ........... 40, 41, 43

*United States v. Davila,* 569 U.S. 597 (2013)...........................................42

*United States v. Faison,* 339 F.3d 518 (6th Cir. 2003) ...........................31

*United States v. Galloway,* 439 F.3d 320 (6th Cir. 2006) .......................23

*United States v. Gutierrez,* 625 Fed. Appx. 888 (10th Cir. 2015)............39

*United States v. Hill,* 79 F.3d 1477 (6th Cir. 1996)........................... 31, 32

*United States v. Johnson,* 344 F.3d 562 (6th Cir. 2010) ........................33

*United States v. Johnson,* No. 1:21-cr-34 (W.D. Mich. 2021) ..... 12, 13, 29

*United States v. Jefferson,* No. 1:21-cr-35 (W.D. Mich. 2021) .... 12, 13, 29

*United States v. Kosier,* 427 F. Supp. 3d 1343 (10th Cir. 2019).............33

*United States v. McDonald,* 121 F.3d 7 (1st Cir. 1997)...........................33

*United States v. Mitchell,* 243 F.3d 953 (6th Cir.2001).............. 40, 41, 43

*United States v. Olano,* 507 U.S. 725 (1993).................................... 40, 46

*United States v. Osborne,* 291 F.3d 908 (6th Cir. 2002)................... 42, 43

*United States v. Roberts,* 980 F.2d 645 (10th Cir. 1992).........................33

*United States v. Sanchez,* 928 F.2d 1450 (6th Cir. 1991), abrogated
    on other grounds by *United States v. Jackson–Randolph,*
    282 F.3d 369 (6th Cir. 2002) .................................................... 34, 35

*United States v. Schock,* 862 F.3d 563 (6th Cir. 2017)..................... 23, 34

*United States v. Silverman,* 976 F.2d 1502 (6th Cir. 1992)....................48

*United States v. Soldano,* No. 1:17-cr-271 (W.D. Mich. 2018).......... 50, 51

*United States v. Tackett,* 113 F.3d 603 (6th Cir. 1997).............................43

*United States v. Thompson*, 586 F.3d 1035 (6th Cir. 2009) .................... 22

*United States v. Wade*, 318 F.3d 698 (6th Cir. 2003) ............................... 26

*United States v. Woods,* 604 F.3d 286 (6th Cir. 2010) ........... 25, 26, 28, 33

**Statutes**

18 U.S.C. § 3231 ..................................................................................... 1

18 U.S.C. § 3553(a) .................................................................................. 51

18 U.S.C. § 3742 ..................................................................................... 1

21 U.S.C. § 846 ................................................................................... 1, 3

21 U.S.C. § 841(a)(1) ............................................................................... 3

21 U.S.C. § 841(b)(1) ............................................................................... 3

28 U.S.C. § 1291 ..................................................................................... 1

**Other Authorities**

6 Cir. R. 30 ........................................................................................... 52

6 Cir. R. 34 ......................................................................................... vii

Fed. R. App. P. 32 ................................................................................ 52

Fed. R. App. P. 34 .............................................................................. vii

Fed. R. Crim. P. 32 ..................................................................... passim

Fed. R. Crim. P. 52(b) ...................................................................... 40, 46

W.D. Mich. LCrR 56.4 .......................................................................... 29

USSG § 1B1.3 ...................................................................................25

USSG § 2D1.1 ...........................................................................passim

USSG § 3B1.1 ......................................................................................4

USSG § 6A1.3 ....................................................................................48

USSG Ch. 5, Part A, Sentencing Table ................................... 5, 14

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Fed. R. App. P. 34 and 6 Cir. R. 34, Defendant-Appellant, Zachary Mr. Kennedy requests oral argument.  Oral argument will allow the parties the opportunity to highlight their written briefs, to address any areas that may be of concern to this Court after a review of the briefs, and respectfully suggests that oral argument will aid the decisional process.

Respectfully requested,

/s/ Deborah A. Solove
Deborah A. Solove
Attorney for Defendant-Appellant
Zachary Kennedy

## STATEMENT OF JURISDICTION

Jurisdiction was proper in the district court under 18 U.S.C. § 3231 because Defendant-Appellant Zachary Mr. Kennedy was charged with and pleaded guilty to a federal crime—conspiracy to distribute and to possess with intent to distribute controlled substances, a felony, in violation of 21 U.S.C. § 846.  The district court announced its sentence in court on November 8, 2021, and judgment was entered on November 15, 2021.  (R . 58, PageID# 339).  A timely notice of appeal was filed on November 17, 2021.  (R. 62, PageID# 398.)  Appellate jurisdiction is proper under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## ISSUES PRESENTED

I.    Whether the district court committed procedural error when it added two points for possession of a dangerous weapon to Mr. Kennedy's offense level.

II.   Whether the district court committed procedural error when it failed to determine that Mr. Kennedy and his counsel had read and discussed the final presentence report and addendum.

III.  Whether the district court committed procedural error when it failed to disregard, on policy grounds, the methamphetamine guideline which makes a 10:1 distinction between "ice" and methamphetamine mixtures.

## STATEMENT OF THE CASE

### A.  Introduction

Defendant-Appellant Zachary Kennedy[1] was charged (Indict., R. 18, PageID## 43-46)[2] with conspiracy to distribute and to possess with the intent to distribute Schedule I and II controlled substances,

---

[1] Defendant-Appellant is referred to herein as "Mr. Kennedy" or "Kennedy."

[2] Citations to electronically filed items include a brief description (unless identified in the preceding sentence), the record number abbreviated "R. __," and the relevant page(s), as "PageID#(#) __."

including 50 grams or more of methamphetamine in violation of 21

U.S.C. § 846 (Count One). He was also charged with two substantive

counts of distribution and aiding and abetting distribution of 50 grams

or more of methamphetamine, a Schedule II controlled substance, in

violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii). He pleaded guilty

to the Count One conspiracy, and the government agreed to dismiss the

remaining two counts. (Plea Agree., R. 38, PageID## 170-179). No one

else was named in Mr. Kennedy's indictment nor identified then or later

by given name as a coconspirator. The statutory penalty was a

minimum of 10 years to a maximum of life. He was eventually

sentenced to 210 months, the top of his contested Guidelines range.

(Sent. Tr., R. 67, PageID# 485).[3]

## B. The Guidelines Computation and Objections

The guideline computation in the final presentence report ("PSR")

started at a base offense level of 32 for between 150 and 500 grams of at

least 80% pure methamphetamine known as "ice."[4] USSG § 2D1.1(c)(4).

(R 49, PageID# 237). It then added two levels as a special offense

---

[3] The sentencing hearing transcript is identified herein as "Sent. Tr."
[4] USSG § 2D1.1 cmt., Note C defines "ice" as "a mixture or substance
containing d-methamphetamine hydrochloride of at least 80% purity."

3

characteristic under USSG § 2D1.1(b)(1) for possessing a dangerous

weapon.  (*Id.*).  There was one additional upward adjustment—four

levels for being a leader of five or more participants under USSG §

3B1.1(a).  (*Id.*).  The resulting offense level at this point was 38 and it

was reduced to 35 by a three-point reduction for Mr. Kennedy's timely

acceptance of responsibility.  (*Id.*).

Both parties objected to the four-level upward adjustment for

being a leader of five or more participants.  (*Id.* at PageID# 254-257).

However, the government repeatedly referred to Kennedy's drug

distribution as the "Kennedy DTO" ("Drug Trafficking Organization") in

its Sentencing Memorandum.[5]  (R. 61, PageID## 352, 354, 368).  In the

same document, the government then affirmed that Mr. Kennedy was

not the leader of a drug trafficking organization at all:

> While there is some indication from sources of information
> that Mr. Kennedy exercised control in certain circumstances,
> and certainly within the context of the Bloods street gang,
> there is no evidence here that, within the confines of the
> charged conspiracy, he shared in the profits of other co-
> conspirators, recruited co-conspirators, fronted drugs to co-
> conspirators, or otherwise exerted the level of control
> contemplated by this enhancement.

---

[5] The government sentencing memorandum was unsealed only as to
defense counsel a full week *after* the sentencing hearing.

4

(*Id*. at PageID# 360.).  The court sustained these objections when the United States affirmed at sentencing that it was "not prepared to prove…the four squares of the four-level enhancement."  (Sent. Tr., R. 67, PageID# 453).  The district court also indicated that in light of that decision then Kennedy's "fourth" objection—to the use of the term Kennedy DTO (¶ 27) in the PSR as well as to the confidential source material referring to Kennedy's gang leadership—were moot.  (*Id*. at 459; PSR Addendum, R. 49, PageID## 257; Def. Obj., R. 48, PageID## 222-225).  This decision alone reduced Mr. Kennedy's offense level to 31. Based on a Criminal History category V, the guideline range was 168 to 210 months.  USSG Ch. 5, Part A, Sentencing Table.

## C.  The Dangerous Weapon Enhancement.

Mr. Kennedy also objected to the PSR's addition of a two-point special offense characteristic for possessing a dangerous weapon in USSG § 2D1.1(b)(1).  (*Id*. at PageID #224; R. 49, PageID# 256).  This "special offense characteristic" applies only to drug offenses referenced to guideline 2D1.l.  No particular weapon was identified by the PSR. (R. 49, PageID## 234, 256).  There was also no contention by the government that one was ever seen with Mr. Kennedy during a drug

5

transaction or at any other time during relevant conduct. (US Sent. Memo, R. 61, PageID## 357-359). Nor was one seized from him or at a location or vehicle associated with him at any time. (*Id.*). No one testified on this enhancement at the sentencing hearing and no affidavits or proffers were presented by either party. (Sent. Tr., R. 67, PageID## 438-491).

Instead, the PSR, the government and the district court relied on two theories: first, on digital evidence on his cell phone consisting of messages and a photo; and second, on guns found at the homes of two or three people arrested on the same date as Mr. Kennedy under a "reasonable foreseeability" theory. (PSR, R. 49, PageID# 256; US Sent. Memo, R. 61, PageID# 358; Sent. Tr., R. 67, PageID## 457-458). However, neither the PSR nor the government raised the "reasonable foreseeability" of gun possession by others until after Kennedy objected to the enhancement. (PSR Addendum, R. 49, PageID# 256; Sent. Tr., R. 67, PageID# 457).

1.   Enhancement Based on Messages and Photo

At the sentencing hearing, the government relied on five exhibits consisting of digital communications to and from Mr. Kennedy's phone

6

and a photo from that phone appearing in the government sentencing memo itself.[6]  (US Sent. Memo, R 61, PageID# 358; Exhibits, R. 61-1, PageID## 369-396).  Each message has a time and date with the earliest being November 2, 2020, and the latest on December 26, 2020. (Exs. 2 and 3, R. 61-1, PageID## 386-387).  When Mr. Kennedy was arrested only five weeks later, he had no drugs and no firearms.  (2-2-21 docket entry of arrest).  No premises search was done, and his only charged drug sales, with "CS-1," were a year earlier, in December 2019. (Complaint,  R. 1, PageID# 6-8; Indictment, R. 18, PageID## 44-45). Within two months, law enforcement terminated CS-1's relationship with them because it "was no longer fruitful and could not provide any additional information on members of the KENNEDY DTO." (Complaint, R. 1, PageID# 6, fn.1).  He was later in state custody with gun and drug charges pending against him.  (*Id.*). .

The messages relied on by the government were with individuals identified only as "Pops," "Fresh," "Kaos," "Mulley" and "♂♂."  (Exhibits, R. 61-1, PageId## 369-396).  Individuals mentioned in the texts

---

6  The relevant exhibits 1 through 5 are attached to the government's sentencing memorandum.  They are referred to herein as "GX#__".

included "Lil Duwey," "Ro (Rowe)," "Ben y son," "Ja," "Mul (Mulley)" and "d. bailey." (*Id.*). Places mentioned in the messages included "Tricey hood/house," "Mulley house," and "Mulley daddy house." (*Id.*). (*Id.* at PageID# 369-396). The government offered no identification information for any of these individuals or locations except it did claim at the sentencing hearing that the message from Mr. Kennedy to the person using double male gender symbols (♂♂) on December 21st was Mr. Kennedy's girlfriend, "Ja." (US Sent. Memo, R. 61, PageID# 357).

Mr. Kennedy's sentencing memorandum did not reference the exhibits since it was filed before the government's sentencing memorandum relying on these exhibits. (Def. Sent. Memo, R. 51 docketed 11-2-21; US Sent. Memo and Exhibits, R. 61 and 61-1, docketed 11-15-21; Sent. Tr., R. 67, PageID# 444). At the hearing, defense counsel argued that even if the messages said what the government claimed, they still did not prove that Mr. Kennedy possessed a gun during the drug conspiracy. Further, he argued, the use of guns for drug distribution versus for gang involvement cannot be shown, particularly where the government saw the two as so separate that the leadership enhancement did not apply. (*Id.* at PageID## 454-

8

455.)

## 2.   Summary of Messages (Chronological Order)

"Kaos" messages, GX 3, discuss a firearm and ammunition, but there is nothing about gangs or drugs.  (R. 61-1, PageID## 387-393).  On November 21, 2020, Kaos sent a photo of an automatic rifle asking if owner still wanted it and claiming that he had clips and bullets. (*Id*. at 387-388).  Owner says he would let him know but was still at work. (*Id*.).  Four days later owner asks questions about the rifle's type and size, but there is never an indication that owner acquired the firearm. (*Id*. at 389).  Over a week later, Kaos messages that someone "is in from Chicago with the switches." (*Id*. at 390-392).  Owner is once again at work but asks what kind, how many and how much. (*Id*.).  Kaos does not know how many but says "glocks" and "he want 7 per switch tho." (*Id*.).  Owner says he will call after work. (*Id*.).

"Pops (Javon)" messages, GX 1, do not concern any weapons.  They show two attempts by Pops to buy "cream" on the same day in early December 2020—two to three "zips" in the morning and four more in the evening.  (R. 61-1, PageID## 369-379).  The government memo claims that "cream" is methamphetamine and that "zips" are ounces.

(R. 61, PageID# 352-353). Owner is still at work in the morning and informs purchaser that "Ro" will have it. There is no message showing that the sale took place. (R. 61-1, PageID## 374). Pops wants "four more" later that night. (*Id.*, PageID# 375). Almost three hours into the second conversation, they are still asking each other "Wya" (where you at). Owner finally says he will drop it off at someone's because it is late (10:43 pm) and he needs to get some sleep because he "works all day tomorrow." (*Id.* at 377-379.)

"Mulley" and "♂♂" messages, GXs 4 and 5, concern two guns, but are not about drugs. There is a short message from owner to "Mulley" on December 21st asking him to "go to my spot" and "get them 2 blicks and put them up plz." (GX 4, R. 61-1, PageID ## 394-395). He says that "ja will be there" and that he will call after work. Owner says he texted her and tells Mulley how to get her attention. (*Id.*). There is a message to "♂♂" about the same time saying that "owner" is sending Mulley over there "to pick up those pistols." (GX 5, R. 61-1, PageID# 396).

"Fresh" messages, GX 2, include his unsuccessful attempt on December 21st to buy "vezzo," a slang term for meth, and a separate

discussion on December 22nd and 26th about a "mag." (US. Sent. Memo, R. 61, PageID# 353 ("vezzo"); GX 2, R. 61-1, PageID ## 380-386). On the 22nd, Fresh asks if owner "got the mag." (*Id*. at 382-383). The response is he put both of them at "mulley house." (*Id*.) Finally, on December 26th, owner asks Fresh if he "grabbed the 45 from mulley or jus the 9." (*Id*. at 386). Fresh replies "Just the 9." (*Id*.).

###### 3.   The Photo

The government also relied on an obviously modified photo of Mr. Kennedy with a gun copied from some undisclosed location on his phone. (Sent. Memo., R. 61, PageID# 358). The only information the government included about the photo is the date it was modified—January 9, 2021. (*Id*.). The modification to the photo with the gun places it at an angle on a black background or border and includes a separate small photo of a woman in the top left corner. (*Id*.).

###### 4.   Reasonable Foreseeability Facts

The PSR belatedly (in its response to objections) raised a "reasonable foreseeability" that alleged "members of the Kennedy DTO" would possess weapons in support of the dangerous weapon enhancement. (PSR, R. 49, PageID# 256). The individuals the PSR

named as possessing weapons on the day of their arrests— Delando Johnson, Daris Jefferson and Alezay Coleman—were each charged in separate cases in the Western District of Michigan. *United States v. Johnson*, No. 1:21-cr-34 (W.D. Mich. 2021); *United States v. Jefferson,* No. 1:21-cr-35 (W.D. Mich. 2021); *United States v. Coleman,* No. 1:21-cr-83 (W.D. Mich. 2021). Drugs and one or more firearms were found at searches of two residences allegedly associated with these three individuals. [7] (*Id.*, PageID# 234). The PSR identified no specific conspiratorial actions or coordinated activity with these individuals, stating only: "Additional toll records showed frequent contact between telephones associated with Mr. Kennedy and [them] during the charged conspiracy." (*Id.*).

For the first time at the sentencing hearing, the government argued that the guns possessed by individuals in "related cases" supported Kennedy's gun enhancement. (Sent. Tr., R. 67, PageID# 457-458). The district court then included coconspirator guns in its "totality of the circumstances" decision imposing the enhancement.

---

[7] Neither Coleman's arrest complaint nor information (nor the government's sentencing memorandum) make any reference to Coleman having a gun. Case # 1:21-cr-00083, ECF ## 1-1, 28, and 42.

12

(*Id*.).  None of the individuals identified by the PSR as having "related cases" and guns had names or nicknames[8] that were the same as or similar to any of the message correspondents in Exhibits 1 through 5, nor to people mentioned in those messages.  (R. 49, Page## 229-230).

### 5.  The Trial Court Overruled Mr. Kennedy's Objection

The trial court found that the government had shown by a preponderance of the evidence that Mr. Kennedy possessed or had constructive possession of a weapon.  (Sent. Tr., R. 67, PageID# 457).  Its brief factual explanation of that holding was that:

> [T]he government must prove the defendant had direct physical control over a firearm or constructive possession of the firearm, that the traffic via social media by this defendant, is fraught with many references to firearms closely connected to drug deals being perpetrated by the defendant.

(*Id*. at 457-458).  The court also based its decision on the digital photo "on page 8 of the government's sentencing memorandum" and on the fact that the "defendant's co-conspirators were found with firearms." (*Id*.)  Further, it found that Mr. Kennedy was "directing individuals,

---

[8] Johnson, Jefferson, and Coleman had aliases listed on their indictments in those separate cases:  Fox, Smoove/Yiego, and Zay, respectively.  Case ## 1-21-033, 1-21-034, 1-21-083

including his customers, to store, pick up, transport firearms. (*Id.*).  It further based its ruling on the fact that Kennedy's coconspirators "were found with firearms."  (*Id.*)

With the court's overruling of Mr. Kennedy's objection, the two-point enhancement remained, thus his final offense level remained at 31 and his sentencing range remained at 168 to 210 months.  If the objection had been sustained, his offense level would have been 29. With a criminal history V, his guideline range would have been 140 to 175 months.  USSG, Ch.5, Part A, Sentencing Table.

### D.  The "Read And Discuss" Requirement

Mr. Kennedy wrote two letters to the court that were received together on the day of sentencing.  (Sent. Tr., R. 67, PageID# 439; Letters and Env., R. 68-1, 68-2, PageID## 495-502).  Each counsel received poor copies of the handwritten letters as the hearing began. The contents of the first letter, which were basically an allocution, were not discussed at all.  The contents of the second were not clearly disclosed during the sentencing hearing but were discussed on the record.  (Sent. Tr., R. 67, PageID## 439-442).

Kennedy's trial counsel immediately addressed the point in the

14

second letter that affected him— criticism of his representation. (*Id*. at 439-440). Then he pointed out that the letter affected the sentencing since it "pertains to the taking of the plea." (*Id*.). Without appearing to confer with his client, counsel says Mr. Kennedy should speak before proceeding further. (*Id*.)

Mr. Kennedy starts by saying he "didn't understand the process of like the PSI and all…". (*Id*. at 440). Other inmates were telling him that, "You ain't got your PSI." He was worried about the "timing" because his attorney was not coming to see him. (*Id*.). "I'm thinking we supposed to have this certain amount of time[.] People telling me certain stuff, you supposed to do this." (*Id*. at 440-441) The court clarifies that it was other inmates who gave him these ideas and asks what wasn't being taken care of. (*Id*.). Kennedy mentions the short time before the sentencing and that they hadn't talked:

> [W]ell, when the PSI came, he was supposed to come. I didn't know the government hadn't sent its memorandum until he told me. That's why I'm like okay, I'm not going to send the letter out when you got like two days, I'm like I should have been there for the final PSI. I didn't see him like it seemed weird to me, so I'm thinking like okay, am I going through something going to be way worse than I'm already looking at.

15

(*Id*. at 441-442).  He says that when he got the PSR back after the plea it was totally different than he thought, and he didn't know about enhancements.  (*Id*.)  Instead of clarifying the problem, the court asked what the problem is with counsel's representation.  (*Id*.)  Kennedy responds: "Nothing.  Like it isn't a complaint.  It just like I felt like we weren't on the same page, so to speak." (*Id*. at 442).  The court wants to know what being on the "same page" means.  (*Id*.)  Kennedy again brings up their failure to talk about the PSR.  (*Id*.)  When pressed to say whether counsel was doing a good job for him, Kennedy said that was a poor choice of words, and repeats his inability to get in touch with counsel.  (*Id*. at 442-443).  Kennedy continues, speaking in incomplete sentences, about the difficulty discussing things with his attorney because of the distant county he was in and the protocol at the jail. (*Id*.).  The court does not ask about protocols (presumably related to Covid19) or about what they couldn't discuss.  It asks only whether Mr. Kennedy wants to proceed with his attorney today. (*Id*. at 443). Kennedy says he does.

The pertinent parts of the handwritten letter are:

Excuse Me Sir.  I'd Like To Speak About My attorney Mr. Mitchell.  There Is No Doubt In Mind That He's A Good

16

> Lawyer But In My Opinion He Did A Very Inadequate
> Job. … He Came To See Me A Total Of 6 Times[:]When I
> First Got Here. 2 Times With Some Of My Discovery…2
> Times When He Wanted Me To Sign The Plea…. And
> When He Came To Get It. [omitting discussion about a
> plea versus a trial]. The Last Time I Seen Him Was When
> I Got The 1st PSI Report.  Now I'm 5 Days Away From
> Sentencing And Still Haven't Seen Him Or My Final PSI.
> There Is Other Issues I'd Like To Address But Will Do So
> On Record.

(R. 68-2, PageID# 501).  The letter was mailed on Thursday, November 4, 2021, and the sentencing was the following Monday, November 8, 2021.  (Envelope, R. 68-1, PageID# 499).  The fact that defendant had certainly not seen his final PSR 4 or 5 days before the hearing, and perhaps had never seen it, is not addressed.

Defense counsel confirms there were several difficulties preventing communication including the government's late filing of its sentencing memorandum and its filing under seal. (*Id*. at PageID ## 443-444.)  The government filed two sentencing memoranda, both under seal.  (R. 50, R. 53.).  The court partially unsealed the second of those (concerning a witness at sentencing) on November 3rd and gave defense counsel access.  (R. 55).  The primary government sentencing memorandum was not partially unsealed to give defense counsel access until a week *after* the sentencing hearing.  (R. 61, PageID ## 351-397).

17

Defense counsel explained when, but not clearly what, he dropped off to his client:

> I think Friday[November 5] I went down to see him, took everything I had, and said, 'You read it. I'll be back.' Yesterday [Sunday, November 7] I returned to [the jail.] So he had all of my filings, all of the prosecution's filings, and the PSI. So I can see where he was concerned.

(Sent. Tr., R. 67, PageID# 444). Defense counsel then asked the district court for a short continuance of no more than a week so they could discuss the issues raised in the letter, mentioning the plea. (*Id*.). The court cross-examined defense counsel but never ruled on the request. (*Id*. at 444-445).

The government suggested that the court could proceed if it just asked Mr. Kennedy if he pleaded knowingly and voluntarily, is satisfied with his representation, has had sufficient time to review "the final PSI," and wants to proceed. (*Id*. at 445-446). The district court agreed but then did not follow that advice. The court discussed only the plea with Kennedy but not any other issues raised in the letter. (*Id*. at 446-447). The court then abruptly and ambiguously asked: "Am I correct, Mr. Kennedy, in saying that you wish to withdraw all of the assertions that you made in the letter?" (*Id*.). Mr. Kennedy says "yes, sir" and is

18

told to sit down; and his counsel says he is ready to proceed.  (*Id*.).

The court returned to its standard sentencing script noting the plea and the guidelines range.  (*Id*. at PageID# 448).  The district court asked defense counsel if he has had "ample opportunity" to review "the report" with his client.  (*Id*.).  Counsel says, "yes, your honor." When Kennedy is asked the leading question:  "And Mr. Kennedy, you agree with that; is that correct?" he echoes "yes, sir."  (*Id*.).

### E.   The Objection to The 10:1 Ice to Meth Ratio

Kennedy objected to the PSR's determination of his base offense level based on the current distinction for "less-pure meth" compared to "80% pure meth" or "ice," referring to it as the "meth-ice disparity."  (R. 51, PageID# 318-320).  The PSR found that Kennedy made two sales of methamphetamine ("meth") to a confidential source ("CS") in December 2019.  (R. 49, PageID# 231).  In the first, the DEA laboratory reports "revealed the methamphetamine weighed 99.1 grams and had a purity level of 89% (plus or minus 6%)."  (*Id*.).  In the second sale, the lab indicated that the meth weighed 272.7 grams and had a purity level of 98% (plus or minus 6%).  (*Id*. at PageID# 232).  The defendant was held responsible for 371.8 grams of "Ice" with a base offense level of 32.

USSG §2D1.1(c)(4).  (*Id.* at PageID# 237).

After noting that "different judges have differing opinions" and that one of the judges in the district "does not apply the ICE enhancement," the district court chose to follow the guidelines as written.  (Sent. Tr., R. 67, PageID# 459).  The court overruled the objection.  (*Id.*).

## SUMMARY OF THE ARGUMENT

The district court clearly erred in its determination of key facts and drew conclusions contrary to law when it overruled Mr. Kennedy's objection to the two-level enhancement for possession of a gun during relevant conduct.  The court considered guns found at addresses connected only with government-designated "related case" defendants despite no showing that those defendants were coconspirators and no showing that the guns were reasonably foreseeable to Kennedy.  It compounded this error by including these unspecified guns in a "totality of the circumstances" holding that was based on a totally separate factual and legal theory of possession.

That separate theory—constructive or actual possession—was based on unique facts since no actual firearm was seized or present in

this case.  The "possession element" was based only on text discussions of a gun and on an unrelated photo.  Where no firearm is actually "present," the government does not have a guideline-comment-created rebuttable presumption on the "connection element."  Consequently, the court erred in holding that Kennedy had a guideline-comment-created burden of rebutting the "connection" (between a particular gun and relevant conduct) under a "clear improbability" standard.

Any one of these errors—reasonable foreseeability, totality of the circumstances or placing any burden on Kennedy— is grounds for a finding that the two-level enhancement was improperly assessed.  The case should be remanded for resentencing without the enhancement.

At the commencement of the sentencing hearing, the court learned through a pro se letter that Kennedy had not received the final presentence report or seen his counsel at the time of mailing the letter a few days before the hearing.  Although, in the interim, his counsel had dropped unspecified documents off at the jail on the Friday before the hearing and told him to read them, it was never clear on the record that counsel and client had read and discussed the final PSR as required by F.R.Cr.P. 32(i)(1)(a) which requires literal compliance.  When counsel

21

requested a week's delay to address this and a separate complaint about the plea, the court failed to rule on it.  Although the court eventually asked later in the hearing whether defense counsel has had "ample opportunity" to review "the report" with his client, this is not the equivalent of "read and discuss" and was asked in the face of contrary facts.  The case should be remanded for resentencing.

The court's decision not to follow the policy disagreement raised by a number of courts with the 10:1 ratio in the Guidelines for "Ice" and methamphetamine mixtures resulted in a sentence that is greater than necessary for the crime, particularly here where it was at the top of the Guidelines range.  Defendant is mindful that the court is free to reject these policy arguments but wants to preserve the objection and its rejection for anticipated future changes in the "ice" guideline.

## ARGUMENT

## I.  THE DISTRICT COURT ERRED IN ASSESSING A TWO-LEVEL ENHANCEMENT FOR POSSESSION OF A FIREARM

### A.  Standard of Review

This Court reviews a criminal sentence for procedural reasonableness under an abuse of discretion standard. *Gall v. United States*, 552 U.S. 38, 51 (2007); *United States v. Thompson*, 586 F.3d

1035, 1037 (6th Cir. 2009).  For procedural reasonableness, an abuse of discretion occurs when the court commits a "significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range…[or] selecting a sentence based on clearly erroneous facts… . *Gall*, 552 U.S. at 51.

"This Court reviews the district court's factual findings in calculating the Guidelines range for clear error, but its legal conclusions are reviewed de novo." *Thompson*, 586 F.3d at 1038 (citing *United States v. Galloway*, 439 F.3d 320, 322 (6th Cir. 2006).  Mixed questions of fact and law are also reviewed de novo.  *United States v. Schock*, 862 F.3d 563, 566–67 (6th Cir. 2017).

## B.  The Issue Here Is Unique.

The district court erroneously applied the Special Offense Characteristic for possession of a firearm under USSG § 2D1.1(b)(1), which provides that two points are added to the drug defendant's offense level "[i]f a dangerous weapon (including a firearm) was possessed."  There was no gun found with, near or on Mr. Kennedy at any time nor at any location connected to him.  For possession, the government instead relied on two different sets of facts.  First, it argued

constructive possession based on digital messages where one or more firearms were discussed and on a digital photo of Kennedy with a firearm. (US Sent. Memo, R. 61, PageID# 358). Belatedly, at the hearing, it also raised possession of unidentified firearms found at the homes of "related defendants" in separate cases presumably under a theory that their gun possession was reasonably foreseeable to him. (Sent. Tr., R. 67, PageID# 457). Kennedy objected to this enhancement. (Def. Sent. Memo, R. 51, PageID# 316; PSR, R. 49, PageID# 256; Sent. Tr., R. 67, PageID## 454-455).

The facts in this case are unlike any other case in this circuit where this enhancement has been imposed under either of the above theories. The district court failed to appreciate or discuss this uniqueness. In its failure to sustain Kennedy's objection on these facts, it also made errors of law. Its holding erroneously combined constructive possession and reasonably foreseeable possession by others into a "totality of the circumstances" determination. (Sent. Tr., R. 67, PageID # 458). In addition, it required Kennedy to show that it was clearly improbable that the (unidentified) guns, even though not present, were connected to relevant conduct. (*Id*. at PageID# 458).

24

1. <u>The Government Failed To Prove Reasonable Foreseeability</u>
   <u>Or That Guns Were Possessed By Coconspirators</u>

If law enforcement discovered a firearm possessed by a
coconspirator, then Kennedy could receive the gun enhancement if that
possession was reasonably foreseeable to him. *United States v.*
*Cochran*, 14 F.3d 1128, 1132-1133 (6th Cir.1994)(citing USSG
§1B1.3(b)(1)(B) (sentencing court may take into account, "in the case of
a jointly undertaken criminal activity[,]... all reasonably foreseeable
acts and omissions of others in furtherance" thereof)). "[A]t a minimum,
we require that there be objective evidence that the defendant knew the
weapon was present, or at least knew it was reasonably probable that
his coconspirator would be armed." *Id.* The elements are that the
seized firearm must (1) be connected to the conspiracy and (2) be
reasonably foreseeable. *Id.*; *United States v. Woods*, 604 F.3d 286, 290
(6th Cir. 2010).

The usual "reasonable foreseeability" scenario involves a
defendant's presence at a location, either at the time of or close in time
to, where the gun was found. *E.g.*, *United States v. Barron*, 940 F.3d
903, 912 (6th Cir. 2019). However, even "presence on the scene plus
association with illegal possessors is not enough." *Woods*, 604 F.3d at

25

290 (citation omitted).  Involvement in a drug distribution conspiracy alone is also not sufficient for the inference of foreseeability:

> Our cases "have explicitly rejected 'the fiction that a firearm's presence always will be foreseeable to persons participating in illegal drug transactions.' "

*Woods*, 604 F.3d at 291(quoting *United States v. Catalan*, 499 F.3d 604, 607 (6th Cir. 2007)).  Only where massive amounts of drugs are proven to be in a single location has the Sixth Circuit upheld a district court's reasoned conclusion that possession of a firearm by one's coconspirators was reasonably foreseeable.  *Woods*, 604 F.3d at 291 (listing cases requiring drugs worth at least $60,000).  A finding of foreseeability has not been affirmed where the drug value was lower than $60,000.  *Id*. (citing *United States v. Wade*, 318 F.3d 698, 702 (6th Cir. 2003)); *Cochran*, 14 F.3d at 1133.  In sum, the burden is on the government to prove by a preponderance that drugs, found at the same place as a gun, had significant value under the reasonable foreseeability theory if the defendant is not physically or temporally connected with the location.

There was no evidence in support of reasonable foreseeability here.  The government not only did not meet its burden, but it submitted no evidence at all on this issue.  The only guns identified in

the presentence report are "multiple firearms" seized "at ▮ Estes

Street and ▮ Allen Avenue, residences associated with Johnson,

Jefferson, and Coleman."[9]  (R. 49, PageID# 234). Also seized during

searches at those addresses are unspecified amounts of various drugs

and "thousands of dollars in cash."  (*Id*.)  Kennedy is never connected

with those locations by anyone.

     The government did not argue in its sentencing memorandum

that it was relying on reasonable foreseeability, nor did it mention

actual guns, those individuals, or the search at those residences.  (R. 61,

PageID## 351-368).  Mr. Kennedy, not surprisingly, did not address the

legal theory in his sentencing memorandum.  (Def. Sent. Memo., R. 51,

PageID## 316-318).  The initial presentence report did not rely on a

reasonable foreseeability theory in assessing the enhancement but

raised it only after Mr. Kennedy objected to the enhancement.  (Initial

PSR, R. 46, PageID## 188-216; Final PSR, R. 49, PageID##  235, 237,

256)).

     At sentencing, the government, for the first time, relied on this

---

[9] Defendant's objection to this information was unresolved by the court.
The probation officer placed disputed matters in brackets and in bold
throughout the report.  (PSR, R. 49, PageID## 254-257).

theory (without naming it):

> And finally, I would point out that there were multiple other defendants -- related defendants arrested on February 2nd, and there were several of them that did, in fact, possess firearms, loaded firearms on the day of their arrest. And the Sixth Circuit has made it clear co-conspirators possessing firearms is sufficient to make this firearm enhancement finding in this particular case.

(R. 67, PageID# 457). The government referred to "related defendants[10] arrested on the same date" and not to coconspirators because there was nothing indicating that they were coconspirators. It then misrepresented the circuit's law which is, in fact, diametrically opposed to the government's statement. *Woods*, 604 F.3d at 290-291 (circuit has rejected the fiction a firearm's presence will be foreseeable per se to those involved in illegal drug transactions).

## 2. The Three Individuals Were Not Coconspirators

Before there can be a consideration of reasonable foreseeability, there must be "jointly undertaken criminal activity," i.e. coconspirators. Evidence of who Kennedy's coconspirators were is curiously lacking in this case. They are not named in his arrest complaint, his indictment,

---

[10] This term is not synonymous with coconspirators as discussed in the next section.

28

his plea agreement or his statement of facts at his plea hearing. (R. 1,
PageID## 1-10; R. 18, PageID## 43-46); R. 38, PageID## 170-179; R. 66
PageID## 432-434). The three individuals—Johnson, Jefferson and
Coleman—listed in the presentence report as connected to two
addresses where guns were found, were each charged in three separate
cases. None were charged with drug conspiracies. *Johnson*, No. 1:21-
cr-34 at Dkt. 14; *Jefferson,* No. 1:21-cr-35 at Dkt. 12; *Coleman,* No. 1:21-
cr-83 at Dkt. 28. The facts in their arrest complaint affidavits do not
describe any conspiracy and do not mention or describe Kennedy.
*Johnson* at Dkt. 1-1; *Jefferson* at Dkt. 1-1; *Coleman* at Dkt. 1-1). These
cases are listed in Kennedy's presentence report as "related cases." (R.
49, PageID## 227, 229-230.) There is nothing on Kennedy's case docket
nor on the dockets of the seven cases so designated that would alert
anyone that these eight defendants' crimes were related in any way.
The term apparently arises from the ability of the government to
designate related cases with the clerk under a local procedural rule.
W.D. Mich. LCrR 56.4(b)(iii)(B). If the duty magistrate finds that cases
are "related" (defined as substantial common nucleus of facts, events, or
transactions), he *must* assign them to a single judge. *Id*. at subsection

29

(b)(iii)(A)(5)(emphasis added).  They were not reassigned to the same

judge and remain individual cases.  (PSR, R. 49, PageID## 229-230).

These three individuals were not shown to be coconspirators; thus,

reasonable foreseeability had no application here.

### C.  The Government Failed To Show By A Preponderance Of The Evidence That Mr. Kennedy Possessed A Dangerous Weapon During Relevant Conduct

The district court's erroneous inclusion of supposedly related-

party guns in its "totality" holding dooms the government's constructive

possession argument as well:

> The defendant's co-conspirators were found with firearms,
> so based on the totality of the evidence here, the court
> also notes an exchange [references "Fresh" message and a
> photo]…established possession, and under the
> circumstances -- under the totality of the circumstances
> here, the defendant has not met his burden
> that it's clearly improbable that his possession of the
> firearms was not connected to -- or was connected to drug
> trafficking.

(Sent. Tr., R. 66, PageID# 458.)  Since there were no identified co-

conspirators, then the guns found with Johnson, Jefferson and Coleman

can lend no weight to the court's imposition of a gun enhancement.

The analysis could end here and the case remanded for resentencing

without this enhancement.  In the event this Court reaches the district

court's actual-or-constructive-possession holding, it is independently faulty on two other grounds.

> 1. Unless A Gun Is Physically "Present," There Is No Burden Shifting Regarding The Connection Element

For actual or constructive possession, the government has the burden of showing "by a preponderance of the evidence that '(1) the defendant actually or constructively "possessed" the weapon, and (2) such possession was during the commission of the offense.' " *Catalan*, 499 F.3d at 606 (quoting *United States v. Hill*, 79 F.3d 1477, 1485 (6th Cir. 1996)).  The second requirement—the "connection element"— was relaxed to require only that the dangerous weapon was possessed during relevant conduct.  *United States v. Faison*, 339 F.3d 518, 520 (6th Cir. 2003).

The district court here referred to Kennedy's burden but not to that of the prosecution.  That reference arises from a Guidelines commentary to the gun enhancement:

> The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense.

USSG § 2D1.1, cmt., n. 11(A)[11].  Commentary to the Guidelines is binding "unless it is plainly erroneous or inconsistent with" the guideline itself.  *Stinson v. United States,* 508 U.S. 36, 45 (1993).  Based on this commentary, courts hold that where the government proves by a preponderance of the evidence that a weapon was present, then the defendant must offer evidence that it was "clearly improbable that the weapon was connected with the offense." *United States v. Hill,* 79 F.3d at 1485.  This is an inference the government may rely on to prove the "possession element" only in a specific circumstance:  "The adjustment should be applied if the *weapon* was *present*…".  (emphasis added). Where the government has shown that a firearm possessed (actually or constructively) by the defendant was also actually, physically present at a particular place—*e.g.*, on defendant or near the drugs—or at a particular time—*e.g.*, on the day defendant was arrested or the drugs were sold—only then does the burden shift to a defendant to rebut the "connection" inference.  "[T]the plain language … permit[s] a trial judge to enhance a drug defendant's sentence for mere possession of a

---

[11] This identical note was designated Note 3(A) in earlier versions of the Guidelines.

dangerous weapon even if there is no evidence other than proximity to suggest the gun was connected to the offense." *United States v. Kosier*, 427 F.Supp.3d 1343, 1356-1358 (10th Cir. 2019) (quoting *United States v. Roberts*, 980 F.2d 645, 648-649 (10th Cir. 1992); *see*, *Woods*, 604 F.3d at 290. ("This provision deals only with the question of whether a firearm is connected to the offense.")(quoting *United States v. Johnson*, 344 F.3d 562, 565 (6th Cir. 2010)).

The government clearly failed to prove actual or constructive possession of any weapon that was "present" *i.e.*, that is, "at hand," "nearby," or "available".[12]  Kennedy needed to show clear improbability of a connection only if a weapon was actually "present."

> Where, as here, the government has shown that a firearm *possessed* by the defendant was *present* during the commission of the offense, the burden shifts to the defendant to persuade the factfinder that a connection between the weapon and the crime is clearly improbable.

*United States v. McDonald*, 121 F.3d 7, 10 (1st Cir. 1997)(emphasis added).  Without this factual circumstance, Kennedy has no burden of proof.

---

[12] Synonyms for the adjective "present". *Merriam-Webster.com*. 2022. https://www.merriam-webster.com/thesaurus (8 Apr. 2022).

Every case addressing the elements of this enhancement in the Sixth Circuit involves a weapon that was "present" so the distinction is not addressed.  This fact was recognized in *United States v. Sanchez*, 928 F.2d 1450, 1460 (6th Cir. 1991), abrogated on other grounds by *United States v. Jackson–Randolph*, 282 F.3d 369 (6th Cir. 2002). *Sanchez* points out that the government's burden contains two separate inquiries—possession and connection— but "in most instances they collapse into a single factual determination because the weapon was present when the arrest took place or where the crime was committed." *Id*.  In such "instances, once the government proves a defendant was in possession of a weapon, its burden is satisfied" because it is also inferentially connected with the crime under Note 11.  *Id*.

The court and the government failed to make any distinction between possessed and "present". (Sent. Tr., R. 67, PageID# 456 (AUSA) and 458 (court)).  The court's erroneous Guidelines' interpretation gave the government an inapplicable inference and unfairly shifted the burden to Kennedy.  This legal error must be reviewed de novo.  *Schock*, 862 F.3d at 566–67.  Even if this is a mixed question of fact and law, it would still be reviewed de novo.  *Id*.  Requiring Mr. Kennedy to show a

34

clear improbability of a "connection" without the presence of an actual gun was legal error requiring a remand for resentencing.

### 2. Without The Inference, The Government Failed To Prove The Connection Element

The government relied—without testimony or affidavits—on messages and a photo for both elements.  (US Sent. Memo, R. 61, PageID# 358; GXs 1-5, R. 61-1, PageID## 369-396).  Without the inference and burden shifting, the government had to show two things with these unexplained documents:  First, did they show Kennedy's actual or constructive possession of a dangerous weapon?  Second, if so, did they also show a connection between that weapon and the crime or relevant conduct.  *Sanchez*, *supra*.  Whether or not the messages or photo showed actual or constructive possession of a gun of some type, the connection element was not met here.  Since failure of proof on that element alone dooms imposition of the enhancement, only it needs to be examined.

In the only case that could be located with facts close to the facts here, the enhancement was rejected.  *United States v. Castillo-Nava*, 347 F. Supp. 3d 743 (D.N.M. 2018).  In that case, law enforcement wiretapped phone calls between defendant and a coconspirator in which

35

they discussed cocaine trafficking and El Paso cocaine prices. *Id*. at 744-745. In another intercepted call, they discussed "numerous firearms -- including an AK-47, a Glock 9 handgun, an Uzi fitted with a silencer, and two unsilenced Uzis -- that [defendant] offered as payment for a dug (sic) debt." *Id*. The presentence report applied a two-level enhancement for possession of a dangerous weapon, "because [defendant] discussed both firearms and drug trafficking" in the calls. However, no firearms were found at his arrest or seized from his home. *Id*. at 746. The court recognized that constructive possession has often supported the enhancement. *Id*. It further recognized that the enhancement had been applied if the weapon was present at any point in the offense or during relevant conduct. But, based on the lack of an actual weapon, the court did not impose the enhancement. *Id*. at 747.

The facts here are not nearly as incriminating as the wiretapped conversations in *Castillo-Nava* where no enhancement was imposed. The government claimed that messages between Kennedy and a person known only as "Fresh" concerned guns "that Kennedy acquired and funneled to his criminal associates, including his drug customers, thus demonstrating the interconnected nature of firearms to Kennedy's drug

trafficking activities." (U.S. Sent. Memo., R. 61, PageID# 353). This representation is far beyond what the messages showed.

The text messages between "owner" and "Fresh" cover eight days beginning shortly before Christmas 2020. (US Sent. Memo., GX 2, R. 61-1, PageID## 380-386). On December 21st, Fresh asks owner if he has some vezzo (meth). Owner says "naw" but suggests two other people who might. (GX 2, R. 61-1, PageID# 381) No drug transaction occurs. (*Id*. at 381-382). A day later Fresh asks if owner has "the mag." The government asserts this is "code for a gun magazine." (US Sent. Memo, R. 61, PageID# 353). Owner says he "put them at mulley house," and Fresh says "ok." Four days later, owner asks Fresh if he grabbed "the 45 from mulley or jus the 9." Now the government claims this is about guns even though the preceding conversation dealt with gun magazines which are also identified by ammunition type such as 45 ACP and 9 mm. The government takeaway from these ambiguous messages with a single, unknown person is an unsupported assertion that "Kennedy acquired guns and funneled them to criminal associates." Ignoring the government's hyperbole, the facts not only do not show Kennedy's possession of a weapon, but they fail to show a connection between a

weapon and relevant conduct.  This is particularly true since the government also contended, based on an unnamed confidential source, that Kennedy was in a gang and that his gang activities were not clearly related to his drug dealing.  (PSR, R. 49, PageID#  234-235; Sent. Tr., R. 66, PageID## 452-453).

The court ascribed even more to the Facebook messages than the government, holding that "the traffic via social media by this defendant, is *fraught with many references to firearms closely connected to drug deals* being perpetrated by the defendant."  (Sent. Tr., R. 57, PageID# 458)(emphasis added).  However, except for "Fresh's" failed attempt to buy drugs the day before the "mag" discussion, there are no other messages with anybody that concern both guns and drugs.  (GXs 1-5, R. 61-1, PageID## 369-396).

The photo of Kennedy with a gun likewise has no imagery relating to drugs or any connection with a drug deal.  (US Sent. Memo, R. 61, PageID# 358).  The government contended that the digital photo was "dated less than one month before his arrest (last modified on January 9, 2021)".  *Id.*  There are two problems with the contention.

First, it implies, without argument or law, that a photo modified,

38

but not necessarily taken, during a drug conspiracy is sufficient to prove the connection element.  No case has so held.  Second, dates on cell phones are notoriously unreliable as to when the photo was taken, *i.e.* created.  *E.g.*, *United States v. Gutierrez*, 625 Fed. Appx. 888, 892–93 (10th Cir. 2015)(photo dates in 2000 and 2007 did not match age of child in those years); *John B. v. Goetz*, 879 F. Supp. 2d 787, 831 (M.D. Tenn. 2010)(date created and date modified can be two different times).  A paper version of a digital photo has been "stripped of its metadata" and that metadata might have had more accurate information about when the photo was originally taken.  https://www.tsl.texas.gov/slrm/blog /2018/10/faq-is-metadata-a-part-of-an-electronic-record-or-not.  The lack of expert or forensic testimony or affidavits regarding the phone and the photo make its inclusion irrelevant on the connection element.

Further, this particular photo has obviously been modified to fit diagonally within a black border and to insert a separate photo of a woman in the upper left-hand corner.  The date of this modification ("modified date") is not evidence of the date the photo was taken and the apparent gun was possessed.

The government has not shown the connection element by a

preponderance.  Without this element there is no need to address

constructive possession.  The district erred in its imposition of the two-

level gun enhancement without a connection to relevant conduct.

## II.  THE DISTRICT COURT FAILED TO CONFIRM THAT KENNEDY AND HIS COUNSEL READ AND DISCUSSED THE FINAL PRESENTENCE REPORT

### A. Standard Of Review

Kennedy's counsel did not object to this error at the sentencing

hearing but Kennedy himself had written a letter to the court that

raised this issue.  The failure to comply with Fed. R. Crim. P. Rule

32(i)(1)(A) requires literal compliance and a remand for resentencing.

*United States v. Mitchell,* 243 F.3d 953, 955 (6th Cir. 2001); *United

States v. Cruse*, 59 Fed. Appx. 72, 80–81 (6th Cir. 2003).  If the court

reviews for plain error, it must find an obvious error, that "affected

substantial rights," and that " 'seriously affect[ed] the fairness, integrity

or public reputation of judicial proceedings."  *United States v. Olano,*

507 U.S. 725, 736, (1993); *see also* Fed. R. Crim. P. 52(b).

### B.  The Record Does Not Reflect That Kennedy And His Counsel Read And Discussed The Final PSR

While it seems obvious that a defendant and his counsel will read

and discuss the Final PSR before a sentencing hearing, the rules

actually require the sentencing court to determine that this has in fact

occurred.  The Federal Rules of Criminal Procedure, Rule 32(i)

(Sentencing), provides:

> (1) In General. At sentencing, the court:

> (A) must verify that the defendant and the defendant's
> attorney have read and discussed the presentence report
> and any addendum to the report[.][13]

The court need not ask this specific question if the matter can be

verified from the statements at the hearing.  *Mitchell,* 243 F.3d at 955.

A sentencing court's failure to ascertain that defendant had read and

discussed his presentence report with counsel, as mandated by rule,

requires a new sentencing hearing.  *Id.*  This new sentencing hearing is

required whether or not a defendant could show actual prejudice as a

result of the error.  *Id.*; *contra.*, *U.S. v. Burleson,* 419 Fed. Appx. 649

(6th Cir. 2011)(if plain error review, actual prejudice must be shown.)

In *Mitchell,* arguments by defense counsel at the hearing indicated

"both that he had read the presentence report and that he and Mitchell

had discussed Mitchell's background," but this was not sufficient.  *Id.*;

---

[13] Prior to an amendment effective in 2002, this provision was formerly
found at F.R.Cr.P. 32(c)(3)(A).  *Cruse*, 59 F. Appx. at 80-81.

*United States v. Osborne,* 291 F.3d 908, 910 (6th Cir. 2002)("the fact that a defendant and his counsel may have discussed issues contained in the report is insufficient—there must be evidence on the record that the defendant and his counsel have read and discussed the report"). The hearing transcript did not, however, demonstrate that Mitchell and his counsel "read and discussed" the report and appendix itself. Accordingly, the district court could not have made such a determination.

In a limited class of cases, the Supreme Court has concluded that an error is structural, and "thus subject to automatic reversal" on appeal. *Neder v. United States*, 527 U.S. 1, 8 (1999). The category of structural errors includes, for example, the "denial of counsel of choice, denial of self-representation, denial of a public trial, and failure to convey to a jury that guilt must be proved beyond a reasonable doubt." *United States v. Davila*, 569 U.S. 597, 611 (2013). Such an error in a sentencing—failure to find that defendant and counsel have read and discussed the final presentence report— fits in the structural defect category, and thus defies analysis by harmless-error standards.

Structural errors are those that affect the "entire conduct of the

42

[proceeding] from beginning to end." *Greer v. United States*, 141 S.Ct. 2090, 2100 (2021)(quoting *Arizona v. Fulminante*, 499 U.S. 279, 306 (1991)).  It appears that cases like *Mitchell, Osborne,* and *Cruse* which remand for resentencing unless the court literally complies with the rule are in effect finding a structural defect. *Compare, Burleson,* 419 Fed. Appx. 649 (plain error review for violation of F.R.Cr.P. 32(i)(1)(A)) *with, United States v. Tackett,* 113 F.3d 603, 613 (6th Cir. 1997) (also requiring literal compliance with F.R.Cr.P. 32(c)(3)—regarding determining disputed facts—and not engaging in plain error review). Because the Sixth Circuit has previously recognized "the significant role that Rule 32's requirements play in ensuring a just adjudication at the sentencing hearing, by requiring literal compliance…", that is tantamount to finding a structural defect when the requirements are not met. *Tackett*, 113 F.3d at 613.

In this case, the sentencing court did not comply with F.R.Cr.P. 32(i)(1)(A)'s "read-and-discussed" requirement.  Nor does the record allow such a conclusion.  Five days before the sentencing, Kennedy had never seen his final presentence report.  (Letter, R. 68-2, PageID# 501). Both Mr. Kennedy and his counsel confirmed that there were real

43

problems caused by Kennedy being moved to a more distant prison in another county, by the failure of the U.S. Marshal's phone system, by protocols at the prison "that really messe[d] with the conflict of trying to see stuff," and the difficulty Kennedy had trying to reach his counsel. (Sent. Tr., R. 67, PageID ## 440-444).  Defense counsel waited until he thought he had everything together before he delivered anything to Kennedy and part of the delay was caused by the government's filing of its two sentencing memoranda under seal.  (*Id.* at 443-444).  Since there were two government sentencing memos, it is not clear on this transcript whether or not defense counsel even had the primary memorandum since it was not unsealed until a week after the hearing. (US Supp. Sent. Memo, R. 51, 51-1, PageID## 330-333; US Sent. Memo, R. 61, 61-1, PageID## 351-396).

Defense counsel says he dropped "everything I had" off at the jail three days before the hearing and "told [Kennedy] to read everything and I will be back."  (Sent. Tr., 67, PageID# 444).  He does not say what he dropped off and does not mention the final PSR.  The day before the hearing, defense counsel returned to the jail but failed to say what occurred.  (*Id.*).  After defense counsel asked for a week's delay, the

government suggested that the court ask defendant, *inter alia*, "if he had sufficient time to review 'the final PSI' and wants to proceed." (*Id.* at 445-446). Although that is not the Rule 32 read-and-discuss question, the court failed to ask Kennedy any questions about the final PSR and failed to address defense counsel's request for a one-week delay. (*Id.* at 446-447).

The hearing then returned to its standard sentencing script. Without ever mentioning the PSR again, the problems with meetings, or late delivery of documents, the court inquired whether defense counsel has had "ample opportunity" to review "the report" with his client. (*Id.* at 448). This was not the equivalent of "read and discuss" and did not even specify what report he was asking about. Given the existing record of failures of communication between Kennedy and his counsel and the short time they had, this is neither the correct question nor does it resolve the issues already on the record. Then the court asked Kennedy a cross-examination-format question: "And Mr. Kennedy, you agree with that; is that correct?" This is an intimidating approach and not the neutral open-ended question called for during this

crucial step on this already highlighted, problematic issue.[14]

There was not literal compliance with Rule 32 and the case should be remanded for resentencing. If this Court analyzes this under plain error, it should find that these errors constitute structural errors in this sentencing as that appears to be the other side of the "literal compliance" coin. If it does not find a structural error, it can find an obvious error that "affected substantial rights," and that " 'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Olano,* 507 U.S. at 736; Fed. R. Crim. P. 52(b).

The outcome of the two-level enhancement could have been different if Kennedy and his counsel had discussed the still disputed facts in the final PSR and the two-level gun enhancement. Better preparation would have been important in having the full case law on the issue before the court. Further, there would have been more than a half-hearted attempt to object to a non-victim witness's in-court statement regarding what the PSR deemed "non-relevant conduct"

---

[14] Contrast this with this same court's question in a recent sentencing: "You've had ample opportunity of reviewing the presentence report with your attorney?" *United States v. Brown,* No. 1:20-cr-02 (W.D. Mich. 2020)(*Brown* Sentencing Transcript at ECF 42, PageID# 178).

about the death of her child.  (R. 49, PageID# 237-238).  This witness's statement was inflammatory, extremely prejudicial, and clearly of importance to the court given its harsh questioning of Kennedy on the subject, particularly the non-corroborated information in the PSR from a confidential information.  (Sent. Tr., R. 67 at PageID## 479-480).  His counsel had obviously not warned Kennedy about answering questions or speaking on this subject.  He also did not stop the court's questioning by asserting Kennedy's Fifth Amendment right to be silent about a matter under an ongoing police investigation.  (*Id*.; PSR, R. 49, PageID# 237-238).  And when Kennedy stopped answering, the court commented sarcastically on his constitutionally protected right to silence. (*Id*.).

The facts of this offense and Kennedy's history do not present any obvious facts supporting the sentence at the top of the guidelines.  If the court had not allowed the extraneous and unverified facts regarding the coincidental death of a child a year before the government arrested Kennedy and if it had not relied on information from confidential sources regarding that death and regarding gangs, it appears that the sentence would have been much lower.  The sentencing court can rely on hearsay, but when the hearsay comes from an unidentified source,

*i.e.* a confidential informant, two requirements must be met:  1) "good cause for the non-disclosure of the informant's identity"; and 2) "sufficient corroboration by other means." *United States v. Silverman*, 976 F.2d 1502, 1504 (6th Cir. 1992) (quoted case omitted); *accord,* USSG § 6A1.3(a) p.s.  Neither were met here.

Whether under plain error review or literal compliance, this Court should find that this case should be remanded for resentencing.

## III.  THE GUIDELINES' 10:1 "ICE" TO METH RATIO SHOULD BE DISREGARDED

Kennedy objected to the 10:1 ratio in the Guidelines for sentences for "ice" versus lower purity mixtures containing methamphetamine. USSG § 2D1.1 and Note (C) to drug quantity table. (Def. Obj., R. 48, PageID# 224; Sent. Tr., R. 67, PageID# 459).  He appeals that objection's overruling but is mindful that the district court does not commit error by following an otherwise applicable guideline.  Kennedy wishes to preserve this issue for any future changes in the "ice" guidelines as more courts disregard it.

The district court here acknowledged that one of the judges in the same district does not apply the "ice enhancement." (*Id*.). However, that so-called "enhancement" was applied to Kennedy, with the guideline

48

treating his quantity of  "ice" the same as ten times the same quantity of a meth mixture of lesser purity.[15] USSG § 2D1.1(c)(4) and (c)(6). That difference is always significant and here it caused a four-point increase in the base offense level from 28 to 32.  *Id*.  At a criminal history level V, that increase resulted in a guideline range, after adjustments, of 168 to 210 months instead of 120 to 150 months.

The Supreme Court has allowed policy disagreements with other drug guidelines based on similar ratios.  *Kimbrough v. United States,* 552 U.S. 85, 106-107 (2007)(holding that "district courts are free to deviate from the Guidelines based on disagreements with the cocaine crack/powder ratio" in particular cases); *Spears v. United States*, 555 U.S. 261, 264 (2009)(guideline may be rejected on a categorical basis and not just on an "individualized" one).

The district judge in the Western District of Michigan who has chosen not to follow the unequal guidelines for "ice" and meth on policy grounds explained her reasons for giving "less deference to the purity-based guidelines" in a Sentencing Memorandum (hereinafter the

---

[15] One of his two drug sales barely met the threshold of 80% purity since it could have been as little as 83% pure ("89% plus or minus 6%").  Final PSR (R. 49, PageID# 231).

"Soldano Memo"). *United States v. Soldano*, No. 1:17-cr-271-1 (W.D. Mich. 7/3/2018). This policy disagreement with the meth guidelines is based in part on the lack of empirical data from the Sentencing Commission and from academic literature to justify the 10:1 ratio. *Soldano* Memo, ECF 330, Page # 1842. The "distinctions seem to be tiered to a similar 10:1 ratio used in the mandatory minimum sentences imposed by Congress." *Id*. at page 1843. It appears that the drug purity sentencing increases were supposed to punish only those defendants who had higher roles in distributing the drug with purity equaling role. *Id*. However, the purity of the meth being sold has steadily risen "at all levels of the distribution chain" so that almost all meth dealers today face the enhanced punishment that was meant to be reserved for the top drug lords. *Id*. at 1845. Accordingly, the "ice" guidelines result in sentencing ranges that are extraordinarily harsh compared with all other drugs. *Id*.

One can only conclude that although meth is a dangerous drug and that significant punishment is deserved, the current guidelines result in excessive sentences that are in fact in violation of the sentencing directive to impose sentences that are "sufficient but not

greater than necessary" to achieve the goals of just punishment, promote respect for the law, provide deterrence and protect the public. 18 U.S.C. § 3553(a).  Kennedy adopts the *Soldana* Memo rational and the resultant method therein of determining the appropriate guideline range.  He acknowledges that each court is free to decline to follow that policy disagreement, but a number of courts have similarly disagreed. See cases cited in the *Soldano* Memo.  This Court could indicate its own disagreement with the methamphetamine ratio.

## CONCLUSION

For all of the foregoing reasons, Defendant-Appellant Zachary Kennedy respectfully asks this Court to reverse the gun enhancement, to vacate the sentence of the district court, and to remand this matter for further proceedings consistent with this Court's opinion.


Respectfully submitted,

<u>/s/ Deborah A. Solove</u>
DEBORAH A. SOLOVE,
Counsel for Defendant-Appellant,
Zachary Kennedy
P.O. Box 2403
Westerville, OH 43086
614-373-3983
dsolove@wowway.com

51

## CERTIFICATE OF COMPLIANCE

Counsel for Appellant hereby certifies that the foregoing brief complies with the type-volume limitation provided in Federal Rule of Appellate Procedure 32(a)(7)(B). The relevant portions of the foregoing brief contain 10,236 words in Century Schoolbook (14-point) type. The word processing software used to prepare this brief was Microsoft Office 365, Word Version 2203.

/s/ Deborah A. Solove
Deborah A. Solove
Counsel for Appellant

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

In accordance with 6 Cir. R. 30, Appellant hereby designates as "Relevant District Court Documents" the following documents filed in the district court and available via that court's electronic CM/ECF system are listed here in **filed date order**:

| Record No. | Date | Description | Page ID ## |
|---|---|---|---|
| NA | | Docket | NA |
| 1 | 1/29/21 | Complaint | 1-10 |
| 18 | 2/24/21 | Indictment | 43-46 |
| 38 | 6/21/21 | Plea Agreement | 170-179 |
| 46 | 9/23/21 | Initial Presentence Report (SEALED) | 188-215 |
| 48 | 10/12/21 | Defendant's Objections to Initial Presentence Report (SEALED) | 222-225 |
| 49 | 10/28/21 | Final Presentence Report (SEALED) | 226-259 |
| 51 | 11/2/21 | Defendant's Motion For Downward Variance and Sentencing Memo | 309-320 |
| 55 | 11/3/21 | US Supplemental Sentencing Memorandum (SEALED) | 331-332 |
| 58 | 11/15/21 | Judgment (Public Portion) | 339-345 |
| 61 | 11/15/21 | US Sentencing Memo (SEALED) | 351-368 |
| 61-1 to 61-5 | 11/15/21 | US Sentencing Memorandum Exhibits 1-5 (SEALED) | 369-396 |
| 62 | 11/17/21 | Notice of Appeal | 398 |
| 66 | 2/10/22 | Transcript – Change of Plea | 406-437 |
| 67 | 2/10/22 | Transcript – Sentencing Hearing | 438-491 |
| 68-1 to 68-2 | 4/7/22 | Kennedy's Letters to Court on Day of Sentencing and Envelope | 495-501 |

## CERTIFICATE OF SERVICE

I hereby certify that on May 4, 2022, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Sixth Circuit using the CM/ECF system, which will send notification of such filing to the attorneys who have entered appearances for the government at their e-mail addresses on file with the Court.

/s/ Deborah A. Solove
Deborah A. Solove