No. 21-1741

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ZACHARY KENNEDY,

*Defendant-Appellant.*
_____

On Appeal from the United States District Court
for the Western District of Michigan
No. 1:21-cr-00037-PLM
_____

**REDACTED BRIEF FOR APPELLEE**
_____

MARK A. TOTTEN
*United States Attorney*

STEPHANIE M. CAROWAN
*Assistant United States Attorney*
Post Office Box 208
Grand Rapids, Michigan 49501-0208
(616) 456-2404

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................ii

STATEMENT REGARDING ORAL ARGUMENT ..................................iv

STATEMENT OF JURISDICTION..........................................................1

ISSUES PRESENTED ..............................................................................2

STATEMENT OF THE CASE ..................................................................3

SUMMARY OF THE ARGUMENT ........................................................24

ARGUMENT ...........................................................................................25

I.    Standard of Review ......................................................................25

II.   The District Court Conducted a Proper Sentencing Hearing Before
      Imposing a Sentence of 210 Months...........................................26

      A.    The District Court Did Not Commit Plain Error and Instead
            Properly Ensured that Kennedy had Reviewed the PSR and
            was Prepared to Proceed with Sentencing............................26

      B.    The District Court Did Not Clearly Err in Increasing
            Kennedy's Offense Level by Two Levels For Illegally
            Possessing Firearms. ...........................................................31

      C.    The District Court Did Not Abuse its Discretion by Applying
            the Sentencing Guidelines for Methamphetamine as
            Written..................................................................................39

CONCLUSION .......................................................................................42

CERTIFICATE OF SERVICE.................................................................43

CERTIFICATE OF COMPLIANCE ......................................................44

DESIGNATION OF DISTRICT COURT DOCUMENTS ......................45

# TABLE OF AUTHORITIES

## Cases

*Gall v. United States*, 552 U.S. 38 (2007) .................................................25

*United States v. Anderson*, 618 F.3d 873 (8th Cir. 2010) ......................34

*United States v. Ashburn*, 865 F.3d 997 (8th Cir. 2017) ........................34

*United States v. Booker*, 543 U.S. 220 (2005) .........................................25

*United States v. Bostic*, 371 F.3d 865 (6th Cir. 2004) ............................27

*United States v. Brooks*, 628 F.3d 791 (6th Cir. 2011) ...........................42

*United States v. Catalan*, 499 F.3d 604 (6th Cir. 2007) ........33, 35, 37, 38

*United States v. Charles,* 138 F.3d 257 (6th Cir.1998) ...........................26

*United States v. Davila*, 569 U.S. 597 (2013) .........................................31

*United States v. Faison*, 339 F.3d 518 (6th Cir. 2003) ...........................36

*United States v. Hill,* 79 F.3d 1477 (6th Cir.1996) ....................33, 34, 38

*United States v. Jackson-Randolph*, 282 F.3d 369 (6th Cir. 2002) ........33

*United States v. Kamper*, 748 F.3d 728 (6th Cir. 2014) .........................42

*United States v. Mitchell*, 243 F.3d 953 (6th Cir. 2001) ...................28, 31

*United States v. Sanchez,* 928 F.2d 1450 (6th Cir.1991) .................33, 34

*United States v. Tate*, 516 F.3d 459 (6th Cir. 2008)................................27

*United States v. Thannavong,* 533 Fed. App'x. 589 (6th Cir.2013) ........42

*United States v. Thomas*, 933 F.3d 605 (6th Cir. 2019) ..........................26

*United States v. West*, 962 F.3d 183 (6th Cir. 2020) ...............................25

## **Statutes**

18 U.S.C. § 3231 .................................................................................. 1

18 U.S.C. § 3553(a) ....................................................................... 16, 23

18 U.S.C. § 3742(a) ............................................................................ 1

21 U.S.C. § 841(a)(1) ..................................................................... 1, 7

21 U.S.C. § 841(b)(1)(A)(viii) ................................................. 1, 7, 41

21 U.S.C. § 841(b)(1)(C) ............................................................... 1, 7

21 U.S.C. § 846 ........................................................................... 1, 7

## **Other Authorities**

Fed. R. Crim. P. 32(i)(A) ............................................................... 27

Sixth Cir. Instr. 2.10A .................................................................. 34

U.S.S.G. § 1B1.3(a)(1)(B) ............................................................. 40

U.S.S.G. § 2D1.1 ............................................................... 26, 37, 41

U.S.S.G. § 2D1.1(b) ................................................................. 32, 33

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Oral argument is unnecessary in this case because the facts and legal arguments are adequately presented in the briefs and record. The decisional process would, therefore, not be significantly aided by oral argument.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction under 18 U.S.C. § 3231 because Defendant-Appellant Kennedy was charged with and convicted of a federal crime, specifically conspiracy to distribute and possess with the intent to distribute controlled substances, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A)(viii), and (b)(1)(C). On November 15, 2021, the court entered its judgment of conviction and sentence (R.58: Judgment, PageID.339.). Kennedy filed a notice of appeal on November 17, 2021. (R.62: Notice of Appeal, PageID.398.) This Court has authority to grant relief from the sentence as set forth in 18 U.S.C. § 3742(a).

## ISSUES PRESENTED

1.    At sentencing, did the district court commit plain error when it confirmed that Kennedy had reviewed the Presentence Investigation Report with his counsel prior to imposing sentence?

2.    Did the district court clearly err in increasing Kennedy's advisory Guideline range by two levels for possessing firearms in connection with his drug trafficking?

3.    Did the district court abuse its discretion when it applied the methamphetamine Guidelines as written, including the Guideline that includes a 10:1 distinction between "ice" and methamphetamine of lesser potency?

## STATEMENT OF THE CASE

## I.   Kennedy is Charged with Drug Trafficking.

Kennedy was a large scale drug dealer and a leader in the Muskegon, Michigan sect of the Bloods, a street gang connected to drug trafficking, violence, and shootings. His criminal history prior to this case included convictions for manslaughter, illegal weapons possession, possession of controlled substances, and assaulting a police officer. (R.49: PSR, PageID.239-244.)

In November 2019, federal and state law enforcement agencies began investigating Kennedy and his drug trafficking organization in an attempt to identify their sources of supply, locations of drug stash houses, and additional criminal associates. (*Id*. at PageID.231.)  As part of that investigation, on November 26, 2019, a confidential source ("CS") working on behalf of law enforcement arranged to purchase approximately four ounces of methamphetamine from Kennedy. (*Id*.) Kennedy personally arranged the deal using Facebook messenger, even asking the CS if he wanted to purchase heroin in addition to methamphetamine. (*Id*.) Kennedy then instructed the CS to go to his criminal associate, J.R.'s, house to pick up the drugs. (*Id*.)

3

A few weeks later, in December 2019, a CS made a second drug purchase from Kennedy. This time, Kennedy agreed to sell the CS ten ounces of methamphetamine – approximately 272 grams – in exchange for $2,500. (*Id*. at PageID.232.) During this deal, Kennedy delivered the drugs personally rather than working with a co-conspirator to complete the sale. (*Id*.)

Kennedy's drug trafficking efforts continued beyond the two methamphetamine sales in November and December 2019. For example, in early 2020, Kennedy worked with C.M., a significant dealer of methamphetamine in the Muskegon area, to sell both heroin and fentanyl. (*Id*. at PageID.233.) Additionally, during the drug conspiracy, Kennedy was in frequent contact with a contraband cell phone being used by drug traffickers serving sentences in the Michigan Department of Corrections, ultimately contacting the phone nearly 100 times. (*Id*. at PageID.232.) He also frequently communicated with other members of his drug trafficking network in Muskegon, including Delando Johnson, Daris Jefferson, Brent Wilkerson, and Alezay Coleman, during this time. (*Id*.)

4

Kennedy routinely used his cell phone and various social media platforms, including Facebook, to further his drug trafficking efforts. Evidence obtained during the investigation revealed that, during the pendency of the conspiracy, Kennedy "engaged in numerous conversations with multiple individuals regarding the distribution of cocaine base, crystal methamphetamine, heroin, and fentanyl." (*Id.* at PageID.234.) At the same time that he was negotiating drug deals, Kennedy also communicated to his associates about guns, including the purchase of an AK-47 and a Glock semi-automatic pistol. (*Id.*)

Finally, the investigation uncovered evidence that, during the drug trafficking conspiracy, Kennedy and Malik Jones-Smith (one of Kennedy's fellow Muskegon-based drug dealers) were with a two year-old toddler at the time that the toddler died of what was later determined to be a fentanyl overdose. (*Id.* at PageID.237-238.) On the day of the toddler's death, Kennedy picked up the child from her mother under the pretext of going to a nearby grocery store. Instead, Kennedy drove the toddler to J.R.'s house – the same J.R. who delivered methamphetamine on Kennedy's behalf in November 2019. (*Id.*) On the way home, the toddler became unresponsive and was later pronounced dead. (*Id.*)

Medical examiners determined the cause of the toddler's death to be acute fentanyl toxicity. (*Id.* at PageID.238.) At least one witness later told investigators that, the night before the toddler's death, he had been with Kennedy in the same vehicle and had seen Kennedy pour heroin into a clear water bottle to avoid it being found by law enforcement during a traffic stop. (*Id.*)

All of the above events led to Kennedy's arrest on a criminal complaint on February 2, 2021. (*Id.* at PageID.230.) On that same day, law enforcement also arrested several of Kennedy's associates, including Delando Johnson, Daris Jefferson, Brent Wilkerson, Malik-Jones Smith, and Alezay Coleman. (*Id.* at PageID.229-230.) Investigators arrested all of the defendants on various drug trafficking charges. Several associates of Kennedy's, including Delando Johnson and Daris Jefferson, were also charged with illegal gun possession. (*Id.* at PageID.229.)

Given Kennedy's criminal history, his ties to a violent street gang, and the nature of the charges in this case, the court held him without bond pending further proceedings. Then, in late February 2021, a grand jury returned a three-count indictment against Kennedy. (R.18: Indictment, PageID.43.) The indictment charged Kennedy with one count

6

of conspiracy to distribute and possess with the intent to distribute controlled substances, including 50 grams or more of methamphetamine as well as smaller amounts of fentanyl, heroin, and crack cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A)(viii), and (b)(1)(C). (*Id.*) The indictment alleged the conspiracy to have been ongoing between November 2019 and January 2021. (*Id.*) Finally, the indictment included two counts of distribution of 50 grams or more of methamphetamine based on the two drug deals Kennedy coordinated in November and December of 2019. (*Id.*)

## II. Kennedy Pleads Guilty to Participating in a Drug Trafficking Conspiracy and is Sentenced by the District Court.

### A. Kennedy Pleads Guilty to Participating in a Drug Trafficking Conspiracy.

Following indictment, the United States produced extensive discovery to Kennedy's counsel, including, but not limited to, police reports, copies of Kennedy's social media accounts, and forensic copies of cell phones linked to Kennedy and his associates. After reviewing the discovery, in June 2021, Kennedy pled guilty to conspiracy to distribute and possess with the intent to distribute controlled substances, including 50 grams or more of methamphetamine and smaller amounts of heroin,

fentanyl, and cocaine base ("crack"). (R.38: Plea Agmt., PageID.170.) As part of his plea, Kennedy admitted to being involved in the conspiracy from "at least November 2019 until in or about January 2021." (*Id.* at PageID.172.) He further admitted that, during the conspiracy, he "routinely purchased or otherwise obtained his drugs from a variety of co-conspirators, while at other times [he] supplied his co-conspirators with the illegal drugs that they required in order to sell to their customers." (*Id.*) In order to "coordinate with his co-conspirators and to set up various drug deals," Kennedy admitted that he "frequently used cellular telephones and various social media accounts, including Facebook." (*Id.*) Finally, Kennedy specifically admitted that, in November and December 2019, he sold more than 370 grams of methamphetamine to individuals he believed to be drug customers. (*Id.*)

### B. The Presentence Investigation Report Recommends Increasing Kennedy's Guideline Offense Level Based on His Leadership Role and His Possession of Firearms During the Drug Trafficking Conspiracy.

Following Kennedy's guilty plea, the United States Probation Office prepared a Presentence Investigation Report ("PSR"). In it, the writer calculated Kennedy's base offense level to be 32 based on Kennedy's distribution of 371.8 grams of methamphetamine. (R.49: PSR,

PageID.237.) The writer then increased that level twice – by two points for Kennedy's possession of a dangerous weapon and an additional four points for Kennedy's role as a leader or organizer in the conspiracy – before decreasing it by three points based on Kennedy's acceptance of responsibility. (*Id*.) The PSR thus calculated Kennedy's total offense level to be 35 and his criminal history category to be V.

### C. The United States Agrees with Kennedy that the PSR's Recommended Leadership Enhancement Should Not Apply, but Offers the District Court Extensive Evidence in Support of the Firearms Enhancement.

Prior to sentencing, Kennedy objected to both the firearms enhancement and the leadership increase. He also asked the court to vary downward rather than apply the 10:1 "ice to meth" ratio contemplated by the Guidelines. (R.51: Def. Sent. Mem., PageID.314-320.) The United States concurred with Kennedy's objection as to the leadership enhancement in light of the decentralized nature of the conspiracy to which Kennedy pled guilty. (R.61: Gov't Sent. Mem., PageID.359-360.) As the government noted in its sentencing memorandum, "[w]hile Kennedy was undoubtedly an important player in the conspiracy, the conspiracy itself did not have a hierarchical structure in which one individual necessarily yielded more power and influence or demanded a larger share

9

of the profits. Instead, the conspiracy here was decentralized in nature, with Kennedy sometimes acting as a drug seller and other times reaching out to the same co-conspirators in an attempt to obtain drugs." (*Id.*)

The United States maintained, however, that the firearms enhancement was properly assessed in light of the extensive electronic evidence of Kennedy's actual and constructive possession of guns during the pendency of the conspiracy. In support of the enhancement, the United States submitted several exhibits to the district court in advance of the sentencing hearing. Five of the exhibits consisted of text messages between Kennedy and others either discussing drugs or discussing guns or both. Investigators recovered the messages from Kennedy's own cell phone[1] and determined that they were sent during the pendency of the charged conspiracy. (*See* R.61-1 – 61-5: Gov't Sent. Ex., PageID.369-396.)

For example, in late November 2020, Kennedy had conversations with someone named "Kaos" about purchasing an AK-47, along with

---

[1] In his brief, Kennedy refers to the messages as being between "Owner" and others, in an apparent attempt to distance himself from the messages. *See e.g.*, Appellant's Br., p. 9-10. This Court should recognize, however, that Kennedy and "Owner" are one and the same person – the owner of the cell phone that was used to send and receive the text messages. Kennedy was the only owner and user of the phone.

10

three boxes of bullets and two "clips" – magazines. (R.61-3: Ex. 3 Gov't Sent. Mem., PageID.387-388.) As part of the conversation, Kaos described the gun as "not full size" but "like a combat style" and even sent Kennedy a picture of the gun (*see id.* at PageID.387, 389, 393):



In response, Kennedy declared "Ok . . . let's make some magic." (*Id.* at PageID.389.) Then, in December 2020, Kaos and Kennedy had another text conversation about the purchase of firearms – this time Glock

handguns, which Kaos referred to as "switches." (*Id*. at PageID.390-391.) This time, Kaos told Kennedy that "brotha dawg" – a term of affection for fellow Bloods – was "in from Chicago w [with] the switches." (*Id*. at PageID.390.) Kennedy immediately responded "Wat [what] kind?" to which Kaos stated "glocks." (*Id*. at PageID.390-391.) Upon hearing that there were Glocks for sale, Kennedy immediately asked "How many and wats [what's] the tickets." (*Id*. at PageID.391.) "Tickets" is a slang term used by drug traffickers when discussing prices – in other words, Kennedy asked Kaos how much "brotha dawg" wanted him to pay to buy the Glocks. In response, Kaos stated "he want 7 per switch." – $700 per gun (*Id*.)

A few weeks later, Kennedy had another conversation with associates about two pistols. In this conversation, Kennedy told someone named Mulley to "go to my spot and get them 2 blicks and put them up plz ja will be there." (R.61-4: Ex. 4 Gov't Sent. Mem., PageID.394.) As the government noted to the district court, in this text, Kennedy used the code word "blick" to mean pistols and was instructing Mulley to pick them up from where he was living – "my spot" – and that his girlfriend, J.S. – "ja" – would be there when he went to pick them up. (R.61: Gov't Sent.

Mem., PageID.357.) This is evidence that Kennedy had constructive possession of these two firearms – he clearly had dominion and control over the premises where they were located and could also control who had access to the guns.

Additional evidence of Kennedy's constructive possession of the guns arose from Kennedy's texts to his girlfriend on that same day (December 21, 2020). Just minutes before texting Mulley, in fact, Kennedy texted a phone number that investigators identified as being used by J.S. and told his girlfriend, "Ima send mulley by there to pick up them pistols they in the laundry room in the cabinet. . . ." (R.61-5: Ex. 5 Gov't Sent. Mem., PageID.396.)

Finally, later in December 2020, Kennedy had a conversation with a drug customer, "Fresh," about selling Fresh a zip (code for an ounce) of "vezzo" – code for "ice" or crystal methamphetamine. (61-2: Ex. 2 Gov't Sent. Mem., PageID.380-381.) While Kennedy did not have the methamphetamine on hand, he arranged for Fresh to get the drugs from his co-conspirators – "Chain" and "Crack." (*Id.* at PageID.381-382.) Of note, it was during this same discussion about drug trafficking that Fresh asked Kennedy if he "got the mag" – code for a gun magazine. (*Id.* at

PageID.382.) In response, Kennedy stated "I put them at mulley house" – meaning that he put the guns at his associate Mulley's house. (*Id*.)

Four days later, still in the midst of the ongoing drug trafficking conspiracy, Kennedy had another conversation with Fresh about guns. On December 26, 2020, Kennedy asked Fresh if he grabbed the "45" from Mulley or just the "9." (*Id*. at PageID.386.) These numbers refer to calibers of two firearms – a .45-caliber pistol and a 9 mm semiautomatic pistol that Kennedy had stored at Mulley's house. Fresh responded that he had grabbed "Just the 9" – meaning the 9mm handgun. (*Id*.)

The government submitted these text messages to the district court in support of the PSR's recommendation to increase Kennedy's offense level by two points for his possession of a weapon during his drug trafficking offense. In addition, the government included a photograph taken from Kennedy's phone and dated within the term of the conspiracy. (R.61: Gov't Sent. Mem., PageID.358.) The photograph appeared to be a screenshot from a FaceTime conversation between Kennedy and a female. (*Id*.) In it, Kennedy stared straight into the camera while pointing what was obviously a handgun in the same direction:

14



(*Id.*)

**D. The District Court Sentences Kennedy to Serve 210 Months in Prison for Conspiring to Deal Significant Quantities of Illegal Drugs.**

**1. The District Court confirms Kennedy and his counsel are prepared to proceed with sentencing.**

Following the parties' written submissions, on November 8, 2021, the district court held a sentencing hearing. Before turning to the Guidelines and the factors articulated in 18 U.S.C. § 3553(a), the court first addressed two letters that it had received from Kennedy and had

15

shared with counsel. The first could most generously be construed as a statement of allocution by Kennedy. (R.68-1: Ex. 1 Gov't Mtn. to Supp Rec., PageID.495.) It detailed the circumstances that led to Kennedy's decision to deal methamphetamine in November 2019 and also outlined some of the steps Kennedy claimed to have taken while in custody to improve himself. (*Id.* at PageID.496-497.) In the second letter, Kennedy appeared to criticize his attorney and express some confusion about the sentencing process in federal court. (R.68-2: Ex. 2 Gov't Mtn. to Supp. Rec., PageID.501.) Nevertheless, Kennedy indicated that "There Is No Doubt In My Mind That He's [his counsel] A Good Lawyer" and acknowledged reviewing the plea agreement and the initial Presentence Report. (*Id.*)

Kennedy addressed the letters on the record, indicating to the district court that he had not previously understood the timing of the federal plea and sentencing process, and that made him nervous. (R.67: Sent. Tr., PageID.440.) For example, Kennedy said that he had questions when he received the PSR – which he referred to as a PSI. (*Id.* at PageID.441.) For example, he told the court that he initially thought his offense level would be 32 under the Guidelines – which was accurate –

but was unclear about how the enhancements outlined in the PSR might affect his overall offense level. (*Id.* at PageID.441-442.) However, Kennedy clarified that, after his counsel came to meet with him in advance of sentencing, his questions had been addressed. (*Id.* at PageID.442.) Yet, by that time, he had already sent the letter to the court. (*Id.*) During this colloquy, Kennedy ultimately withdrew all of his allegations against his trial counsel, telling the court that counsel had done "nothing" wrong and that he apologized. (*Id.* at PageID.442-443.)

At that point, Kennedy's counsel also had an opportunity to address the letters and his efforts to prepare his client for sentencing. He assured the court that he "took everything I had" to Kennedy for review, including his sentencing memorandum and the PSR. (*Id.* at PageID.444.) "So he [Kennedy] had all of my filings, all of the prosecution's filings, and the PSI." (*Id.*) Counsel gave Kennedy several days to review the filings, and then counsel met with him again to prepare for sentencing.[2] (*Id.*)

---

[2] In his brief, Kennedy implies on several occasions that his counsel did not have access to the government's sentencing filings until *after* the sentencing hearing because the government filed its submissions to the court "restricted access" – meaning only counsel of record would have the ability to review them. *See e.g.*, Appellant's Br., p. 17. Such assertions are in error. On November 3, 2021, nearly a week before sentencing, counsel for the government emailed Kennedy's trial counsel and attached *all* of

Ultimately, prior to turning substantively to the sentencing hearing the district court ensured that Kennedy's concerns had been addressed. For example, the court specifically asked Kennedy, "Am I correct, Mr. Kennedy, in saying that you wish to withdraw all of the assertions that you made in the letter?" (*Id.* at PageID.447.) Kennedy's response: "Yes, sir. Yes, sir." (*Id.*) Kennedy's counsel then confirmed that the sentencing could proceed as planned. (*Id.*) Only then did the court turn to the Guidelines and the other remaining items.

The district court first addressed the Guideline calculations, outlining the offense level, criminal history category, and advisory sentencing range contained in the PSR. (*Id.* at PageID.448.) The court then ensured that defense counsel had reviewed those calculations, as well as the other items in the PSR, with Kennedy, in the following colloquy:

> The Court: Mr. Mitchell, based on your recent meetings with the defendant, I take it you've had ample opportunity of reviewing the report with your client?
>
> Mr. Mitchell: Yes, your Honor.

---

its sentencing filings in order to ensure counsel and Kennedy himself had sufficient time to review them. (R.70-1: Ex. 1 Gov't 2nd Mtn. to Amend Rec., PageID.507.)

The Court:          And Mr. Kennedy, you agree with that; is that correct?

The Defendant:  Yes, sir.

(*Id.*)

### 2. The District Court sustains the parties' objection to the leadership enhancement but rejects Kennedy's objection to the firearm enhancement.

The court then turned to the two outstanding objections to the Guideline calculations – the four-point leadership enhancement and the two-point enhancement for possession of firearms during the drug trafficking conspiracy. Both counsel firsts argued that the leadership enhancement was inapplicable in this case. In its argument, the government never conceded that Kennedy was not a leader in the drug trafficking conspiracy and reiterated clearly that he was a leader in the Bloods street gang. (*Id.* at PageID.452-453.) Instead, the government focused on the fact that the conspiracy itself was structured differently than the conspiracies contemplated by the Guidelines. As the government noted,  the enhancement as contemplated by the Guidelines looks to "a conspiracy that is hierarchical in nature. . . . Unfortunately, or fortunately, that is not the nature of drug trafficking in Muskegon. As

we learned through this investigation, drug trafficking in Muskegon is very decentralized in nature. Sometimes an individual is a drug seller, sometimes the individual is the drug purchaser, depending on who has the quantity of drugs for sale." (*Id*. at PageID.452-453.) The court thus sustained Kennedy's objection as to the leadership enhancement.

The district court next turned to arguments on the two-point enhancement for Kennedy's possession of firearms. (*Id*. at PageID.453-454.) Kennedy's counsel first acknowledged that "several other people in this case . . . were arrested and charged with drug violations. And several of them . . . had firearms on them when they were arrested." (*Id*. at PageID.454.) Nevertheless, counsel argued that the only evidence directly related to Kennedy that supported the firearm enhancement was the text messages and photographs included as part of the government's sentencing memorandum. (*Id*.) Counsel posited that the messages, photos, and the fact that other related defendants were arrested on the same day in clear possession of firearms, though, was insufficient to support the enhancement. (*Id*. at PageID.454-455.)

In response, the government reiterated the arguments made in its sentencing memorandum, outlining the cell phone evidence of gun

possession taken from Kennedy's own phone and also reminding the court that "multiple other defendants" were arrested on the same day as Kennedy, several of whom were in possession of firearms. (*Id.* at PageID.456-457.)

After hearing the arguments of counsel and reviewing the written submissions, the district court overruled Kennedy's objection, holding "that the government, by at least a preponderance of the evidence, has shown that during the course of the conspiracy, the defendant possessed firearms." (*Id.* at PageID.457.) In so finding, the district court cited the fact that Kennedy's co-conspirators were found with firearms, which was outlined in the PSR (*see* R:49: PSR, PageID.229-233), as well as the electronic evidence presented by the government, which it characterized as being "fraught with many references to firearms closely connected to drug deals being perpetrated by the defendant." (R.67: Sent. Tr., PageID.458.)

In finding that the enhancement was properly applied, the court specifically referenced the texts between Kennedy and "Fresh" in which Kennedy asked Fresh about whether he grabbed "the 45" from Mulley or just the "9." (*Id.*) According to the court, that "text traffic, as well as the

photograph [of Kennedy clearly holding a pistol and aiming it at the screen], which is on Page 8 of the government's sentencing memorandum, established possession." (*Id.*)

Having ruled on possession, the district court then evaluated whether, under the totality of the circumstances, it was "clearly improbable" that Kennedy's possession of firearms was connected to his drug trafficking. (*Id.*) The court held that it was not. "In the Court's judgment . . . [t]he defendant is directing individuals, including his [drug] customers, to store, pick up, [and] transport firearms." (*Id.*) As such, Kennedy could not demonstrate that it was clearly improbable that Kennedy's possession of firearms was connected to the drug trafficking conspiracy to which he pled guilty. (*Id.*) "Accordingly, [the court held that] that objection is overruled." (*Id.*)

### 3. The District Court declines to vary from the Guidelines on drug policy grounds.

Kennedy's final objection at sentencing concerned the 10:1 "ice to meth" ratio contemplated by the Guidelines. (*Id.* at PageID.459.) The district court heard from defense counsel on the issue briefly but ultimately held that the disparity reflected a policy decision made by Congress that ice should be treated differently than methamphetamine

22

of lesser potency and declined to vary from the sentencing structure prescribed by the relevant statutes. (*Id*.)

### 4. The District Court hears from a victim, reviews the factors set forth in 18 U.S.C. § 3553(a), and renders sentence.

Having addressed all of the objections to the Guidelines, the district court then heard from a victim – the mother of a toddler who died of a fentanyl overdose while in Kennedy's care during the pendency of the conspiracy. (*Id*. at PageID.460-467.) The court then heard arguments on the factors outlined in 18 U.S.C. § 3553(a) and heard from Kennedy directly. (*Id*. at PageID.467-480.) Based on all of this information, the court ultimately imposed a sentence of 210 months of imprisonment. (R.58: Judgment, PageID.340.) The court based its sentence on the fact that the conspiracy to which Kennedy pled guilty was very serious and involved drugs that "are rampant in the Western District of Michigan." (R.67: Sent. Tr., PageID.482.) In the court's view, Kennedy constituted "a major threat to the public," having shown "blatant disregard" for the consequences of his actions. (*Id*. at PageID.483.) Thus, held the court, "[a] sentence at the top end of the advisory guidelines [210 months] is the appropriate sentence in this case." (*Id*. at PageID.484.)

## SUMMARY OF THE ARGUMENT

The district court conducted a thorough sentencing hearing in which it properly addressed all of the outstanding issues. Specifically, the district court did not commit plain error when it ensured that Kennedy had reviewed and discussed the PSR with his counsel prior to the hearing. The court likewise did not clearly err by increasing Kennedy's offense level under the Guidelines due to his actual and constructive possession of multiple firearms during the pendency of his drug trafficking conspiracy. Finally, the court did not abuse its discretion by applying the methamphetamine Guidelines as written, declining to vary for policy reasons as urged by Kennedy.

# ARGUMENT

## I.  Standard of Review

Because the Sentencing Guidelines are advisory, *see United States v. Booker*, 543 U.S. 220 (2005), "appellate review of sentencing decisions is limited to determining whether they are 'reasonable.'" *Gall v. United States*, 552 U.S. 38, 46 (2007). In determining whether a sentence is reasonable, this Court applies an abuse of discretion standard. *Id*. This is the standard "[r]egardless of whether the sentence imposed is inside or outside the Guidelines range." *Id*. at 51. Applying this standard, "this Court must first ensure that the district court committed no significant procedural error. . . . Assuming that the district court's sentencing decision is procedurally sound, the appellate court should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard. *Id*.

This Court reviews a district court's interpretation of the Sentencing Guidelines de novo and its findings of fact for clear error, *United States v. West*, 962 F.3d 183, 187 (6th Cir. 2020), reviewing the lower court's application of a Guidelines enhancement on the facts of a particular case deferentially. *See id.* (question of firearm possession for

purposes of U.S.S.G. § 2D1.1 reviewed for clear error); *see generally United States v. Thomas*, 933 F.3d 605, 608–10 (6th Cir. 2019) (discussing standards of review for Guidelines enhancements). "A finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Charles,* 138 F.3d 257, 262 (6th Cir.1998) (citations omitted).

"When, however, a party is given an opportunity to object to a sentence in the district court and 'does not clearly articulate any objection and the grounds upon which the objection is based,' [appellate courts] review the objections raised on appeal under the plain-error standard." *United States v. Tate*, 516 F.3d 459, 464 (6th Cir. 2008) (quoting *United States v. Bostic*, 371 F.3d 865, 872-73 (6th Cir. 2004)).

## II. The District Court Conducted a Proper Sentencing Hearing Before Imposing a Sentence of 210 Months.

### A. The District Court Did Not Commit Plain Error and Instead Properly Ensured that Kennedy had Reviewed the PSR and was Prepared to Proceed with Sentencing.

The district court began the substantive sentencing hearing here by ensuring that Kennedy had an opportunity to review the PSR and

discuss it with counsel. (R.67: Sent. Tr., PageID.448.) The Federal Rules of Criminal Procedure explicitly contemplate such a colloquy, instructing that "[a]t sentencing, the court . . . must verify that the defendant and the defendant's attorney have read and discussed the presentence report and any addendum to the report." Fed. R. Crim. P. 32(i)(A).

In satisfying Rule 32, however, "[t]he district court need not make an affirmative inquiry" specifically inquiring whether a defendant has read and discussed the PSR with counsel. *United States v. Mitchell*, 243 F.3d 953, 955 (6th Cir. 2001). The mechanics of the inquiry itself are not prescribed, "so long as [the court] can somehow determine that defendant and counsel have read and discussed the report." *Id.*

Here, the district court began the substantive sentencing hearing by reviewing the Guideline range as calculated by the probation office. (R.67: Sent. Tr., PageID.448.) Judge Maloney clearly stated that "the Court's probation office scored this case at Offense Level 35, Criminal History Category V, resulting in an advisory guideline range of 262 to 327 months." (*Id.*) Those calculations came directly from the PSR, which was prepared by the very same probation office the court referenced. (R.49: PSR, PageID.237.)

Seconds later, the court asked Kennedy's counsel "Mr. Mitchell, based on your recent meetings with the defendant, I take it you've had ample opportunity of reviewing the report with your client?" (R.67: Sent. Tr., PageID.448.) Counsel's response was an unequivocal "Yes, your Honor." (*Id*.) The court then asked Kennedy if he agreed with his counsel's representations about having reviewed the report, to which Kennedy also unequivocally responded "Yes, sir." (*Id*.) At no time did Kennedy or his counsel object that the court had failed to address whether they had reviewed and discussed the PSR, nor did they ever assert that they had not done so.

There is no doubt that the "report" the court was referencing in this colloquy was the presentence report. The PSR was the only report that detailed the Guideline calculations that the court had just summarized. It was the only report prepared by the probation office. Kennedy's attempt to argue to the contrary defies both logic and the record.

Further, the record contains other indications that Kennedy had reviewed the PSR prior to the sentencing hearing. When addressing the court during his initial discussion of his letters, for example, Kennedy stated that he received the "PSI" (using a state court term for what the

federal system refers to as the PSR) and was concerned about the Guideline calculations it contained. (*Id.* at PageID.441.) Kennedy told the court that he had anticipated being assessed an offense level of 32 – the precise base offense level included in the PSR – and then receiving credit for acceptance of responsibility. (*Id.*) He claimed he had not anticipated the enhancements that increased the offense level – enhancements included in the PSR. (*Id.* at PageID.441-442; *see also* R.49: PSR, PageID.237.) Kennedy's statements about his offense level, the enhancements, and even his anticipated credit for acceptance of responsibility all indicate that he had read and reviewed the PSR in detail prior to sentencing.

Kennedy's counsel also discussed reviewing the PSR with Kennedy. Counsel acknowledged receiving the final PSR on October 28, 2021 – the day the PSR was released – and then working on his sentencing memorandum. (R.67: Sent. Tr., PageID.443-444.)  He then discussed taking those two items, as well as the government's sentencing filings, and delivering them to his client the week prior to sentencing. (*Id.* at PageID.444.) He then returned to the jail and met with his client again prior to sentencing. (*Id.*) All of this further supports a finding here that

29

Kennedy and his counsel read, reviewed, and discussed the PSR as required by Rule 32.

Nevertheless, Kennedy tries to paint the district court's colloquy about the PSR – or, as he argues, the lack of colloquy – as constituting structural error that would subject this case to automatic reversal. Appellant's Br., p. 42. Kennedy's argument fails. Structural errors constitute "a very limited class of errors" and include things like "the denial of counsel of choice, denial of self-representation, denial of a public trial, and failure to convey to a jury that guilt must be proved beyond a reasonable doubt." *United States v. Davila*, 569 U.S. 597, 611 (2013) (cleaned up). Kennedy cites no case in which a district court's failure to use precise language in a colloquy about whether a defendant has discussed the PSR with counsel constitutes such a grave error. He also ignores entirely the fact that neither he nor his counsel objected to the court's colloquy here at the time of sentencing.

Ultimately, this Court should find that the district court properly ensured that Kennedy had reviewed and discussed the PSR with counsel. Such a finding is consistent with the record. The district court's failure to use exact language is insufficient to constitute procedural error here

30

given that the colloquy that occurred was sufficient for the court to "determine that defendant and counsel have read and discussed the report" *Mitchell*, 243 F.3d at 955. What's more, even if there was error, it was not plain. The court's colloquy neither prejudiced Kennedy's substantial rights nor effected a miscarriage of justice and does not, therefore, constitute a sufficient basis to overturn the district court's sentence.

### B.    The District Court Did Not Clearly Err in Increasing Kennedy's Offense Level by Two Levels For Illegally Possessing Firearms.

After outlining the Guideline range as calculated by the probation office, the district court then turned to Kennedy's contention that his offense level should not be increased despite his actual and constructive possession of multiple firearms during the pendency of his drug trafficking conspiracy. The district court ultimately overruled Kennedy's objection. (R.67: Sent. Tr., PageID.457.) In doing so, the district court did not clearly err.

The Sentencing Guidelines increase a drug trafficking defendant's Guideline range by two levels "[i]f a dangerous weapon (including a firearm) was possessed" in connection with the offense. )U.S.S.G. §

2D1.1(b. This enhancement "reflects the increased danger of violence when drug traffickers possess weapons . . . [and] should be applied if the weapon was present, unless it was clearly improbable that the weapon was connected with the offense." *Id.* at App. N. 11(A).

Establishing that the firearms enhancement applies is a two-step process, with the government first charged with proving the defendant's possession and the defendant then charged with demonstrating that "it was 'clearly improbable' that the weapon was connected to the offense." *United States v. Catalan*, 499 F.3d 604, 606 (6th Cir. 2007) (citing *United States v. Hill,* 79 F.3d 1477, 1485 (6th Cir.1996)). "Once it is established that a defendant was in possession of a weapon during the commission of an offense, a presumption arises that such possession was connected to the offense." *United States v. Sanchez,* 928 F.2d 1450, 1460 (6th Cir.1991) (*abrogated on other grounds by United States v. Jackson-Randolph*, 282 F.3d 369 (6th Cir. 2002)); *see also Hill*, 79 F.3d at 1485.

The government's burden to establish possession is "a very low bar" – for example, "evidence that the weapon was found in the same location as drugs or drug paraphernalia usually suffices." *United States v. Anderson*, 618 F.3d 873, 881-82 (8th Cir. 2010); *see also United States v.*

*Ashburn*, 865 F.3d 997, 999 (8th Cir. 2017). In the Sixth Circuit, "[t]o establish actual possession, the government must prove that the defendant had direct, physical control" over the firearm. *See* Sixth Cir. Instr. 2.10A. Meanwhile, "[c]onstructive possession of an item is the 'ownership, or dominion or control' over the item itself, 'or dominion over the premises' where the item is located." *Sanchez,* 928 F.2d at 1460 (citation omitted).

Here, the government presented evidence both of Kennedy's actual possession and constructive possession of multiple weapons. For example, the government presented a screenshot from Kennedy's phone, with a time stamp indicating it was last modified during the pendency of the conspiracy, in which Kennedy had a pistol in his hand. (R.61: Gov't Sent. Mem., PageID.358.) The government also presented text messages from Kennedy to others in which he, as the district court found, was "directing individuals, including his customers, to store, pick up, [and] transport firearms." (R.67: Sent. Tr., PageID.458.) The district court held that Kennedy's social media traffic was "fraught with many references to firearms closely connected to drug deals being perpetrated by the defendant." (*Id*.) This shows that Kennedy had "direct, physical control"

over some guns and that he also exercised dominion or control over others, storing them at his property and trusting them to his criminal associates, including his girlfriend.

The dates of the evidence presented by the government establish that Kennedy's possession of the guns was "during the commission of the offense," *see Catalan*, 499 F.3d at 606, – namely, the drug trafficking conspiracy to which Kennedy pled guilty. Each of the text message strings occurred in either late 2019 or in 2020. (R.61-1 – 61-6: Exs. 1-6 Gov't. Sent. Mem., PageID.369-397.) The photograph of Kennedy with a gun in his hand was last modified in January 2021. (R.61: Gov't Sent. Mem., PageID.358.) Kennedy admitted to participating in a drug trafficking conspiracy "[f]rom at least November 2019 until in or about January 2021." (R.38: Plea Agmt., PageID.172.) And even if the texts had occurred outside those dates, they would have nevertheless been sufficient under the current Guidelines to establish Kennedy's possession of firearms and the connection of those firearms to the offense of conviction. *See United States v. Faison*, 339 F.3d 518, 520 (6th Cir. 2003) (recognizing that "all that the government need show [for the firearms

enhancement to be applied] is that the dangerous weapon be possessed during 'relevant conduct'").

Kennedy, however, disputes or otherwise seeks to minimize the government's evidence. For example, he argues that the photo of him holding a pistol was "obviously modified." Appellant's Br., p. 11. He makes this claim without any evidence to support it. He did not object to the photograph in the district court. Instead, his counsel conceded that the government's sentencing memorandum included "a photograph of my client holding a gun" and also acknowledged that it was "[p]robably his [Kennedy's] own photograph." (R.67: Sent. Tr., PageID.454.) The district court credited that evidence, finding that the photograph depicted Kennedy in clear possession of a firearm (*Id.* at PageID.458), and that finding is not clearly erroneous.

Kennedy also engages in a rather torturous reading of the Guidelines in an attempt to bolster his argument. The Guidelines clearly instruct that the two-point firearm enhancement "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1, App. N. 11(A). Kennedy erroneously construes this language to mean that *only* if the government

establishes possession of the weapon *and* that a weapon was physically with drugs should the burden shift to the defendant to show that it was "clearly improbable" that the weapon was connected to the offense. *See* Appellant's Br., p. 31-35.

Kennedy's argument is not what the case law requires. As this Court held in *Catalan*, "[o]nce the government establishes by a preponderance of the evidence that '(1) the defendant actually or constructively "possessed" the weapon, and (2) such possession was during the commission of the offense,' the burden shifts to the defendant to show that it was 'clearly improbable' that the weapon was connected to the offense." 499 F.3d at 606 (quoting *Hill*, 79 F.3d at 1485). Here, the government proved both elements – it presented evidence of Kennedy's actual and constructive possession of firearms and evidence that Kennedy's possession was during the commission of the drug trafficking conspiracy.

With the government having met its burden, the district court then properly evaluated whether Kennedy could demonstrate that it was "clearly improbable" that the firearms he possessed were connected to the conspiracy. (R.67: Sent. Tr., PageID.458.) Kennedy could not meet that

36

burden. Instead, he offered only vague suggestions that the guns referenced in the government's evidence "may have had more to do with gang behavior than drug behavior." (*Id*. at PageID.455.) Such allusions are insufficient.

Kennedy's final argument as to the inapplicability of the firearm enhancement is based on his contention that the evidence of co-conspirators being in possession of guns, drugs, and money should not have been attributed to Kennedy or otherwise credited by the court. *See* Appellant's Br., p. 25-30. Kennedy's analysis primarily focuses on three related defendants who were all arrested on the same day as Kennedy and all of whom were engaged in drug trafficking in the Muskegon area – Delando Johnson, Daris Jefferson, and Alezay Coleman. Both Johnson and Jefferson were charged with and convicted of possessing firearms in furtherance of their drug trafficking offenses. (R.49: PSR, PageID.229-230.) Kennedy was in frequent contact with all three men during the pendency of the charged conspiracy, calling them multiple times. (*Id*. at PageID.232.)

Kennedy was also in text communication with other uncharged co-conspirators, namely, the individuals outlined in the exhibits attached to

the government's sentencing memorandum. For example, in late 2020, Kennedy had a conversation with "Fresh" about purchasing methamphetamine. (R.61-2: Ex. 2 Gov't Sent. Mem., PageID.380.) He then discussed connecting "Fresh" with co-conspirators "Chain" and "Crack" about whether they could fulfill the meth order. (*Id.* at PageID.381-382.)   The next day, Kennedy continued his conversation with "Fresh" but this time transitioned the discussion from drugs to guns. (*Id.* at PageID.382-386.)

This evidence, when considered in its totality, establishes that it was reasonably foreseeable that those who joined Kennedy's criminal activity, whether or not they were ultimately charged, would possess firearms as part of the drug trafficking conspiracy. *See* U.S.S.G. § 1B1.3(a)(1)(B) (indicating that defendants who undertake joint criminal activity should be held accountable for the acts and omissions of others that were, among other things, "reasonably foreseeable in connection with that criminal activity"). The fact that, as Kennedy argues, the co-conspirators were not charged with conspiracy is irrelevant. The Guidelines specifically contemplate that a defendant can be held

responsible for jointing undertaken criminal activity "whether or not charged as a conspiracy." *Id.*

The district court recognized that it should consider the evidence of co-conspirators' possession of firearms but ultimately relied primarily on the photograph and text messages to find that the firearm enhancement applied in this case. (R.67: Sent. Tr., PageID.458.) The factual findings made by the court are supported by the evidence and support the imposition of the enhancement in this case.

### C. The District Court Did Not Abuse its Discretion by Applying the Sentencing Guidelines for Methamphetamine as Written.

In calculating Kennedy's Guideline range, the district court applied the drug quantities outlined in U.S.S.G. § 2D1.1. Under this section, "pure" or "actual" methamphetamine is assigned a higher offense level, with the ratio of "actual" methamphetamine to a "mixture" of methamphetamine ultimately being 10:1. This reflects the statutory determination that 50 grams of actual methamphetamine is sufficient to trigger a ten-year mandatory minimum, while 500 grams of a mixture of methamphetamine is needed to trigger the same penalties. *See* 21 U.S.C. § 841(b)(1)(A)(viii). As the Guidelines indicate "[t]he purity of the

controlled substance . . . may be relevant in the sentencing process because it is probative of the defendant's role or position in the chain of distribution." U.S.S.G. § 2D1.1, App. N. 27(C).

Here, the district court applied the Guidelines as written. Kennedy concedes that "the district court does not commit error by following an otherwise applicable guideline" but nevertheless argues that the court should have adopted other courts' policy objections to the methamphetamine Guidelines. Appellant's Br., p. 48-51. As this Court has historically articulated, "the district court is not required to reject the Guidelines range, even if it disagrees with the ratio on policy grounds." *United States v. Kamper*, 748 F.3d 728, 742 (6th Cir. 2014). More to the point, "the fact that a district court *may* disagree with a Guideline for policy reasons and *may* reject the Guidelines range because of that disagreement does not mean that the court *must* disagree with that Guideline or that it *must* reject the Guidelines range if it disagrees." *United States v. Brooks*, 628 F.3d 791, 800 (6th Cir. 2011) (emphasis in original); *see also United States v. Thannavong,* 533 Fed. App'x. 589, 592–94 (6th Cir.2013) (affirming a district court's conclusion that the Guidelines' MDMA-to-marijuana ratio should not be rejected because it

40

was not persuaded that the policy arguments undermining the Guidelines range outweighed other § 3553(a) factors).

The district court considered Kennedy's objection and request to disregard the 10:1 ratio of actual methamphetamine to a mixture of methamphetamine. (R.67: Sent. Tr., PageID.459.) The court acknowledged that different judges have different opinions on the issue, including one of the other judges in the Western District of Michigan.[3] (*Id.*) However, the court, upon considering those disagreements, ultimately determined that applying the Guidelines as drafted was appropriate, noting that the Guidelines "are consistent with Congress' passage of the statute in relation to ICE" and also acknowledging that Congress and the executive branch, and not the court, are the policy makers on this issue. (*Id.*) These findings were not an abuse of the court's

---

[3] The judge in the Western District of Michigan who has expressed her disagreement with the 10:1 methamphetamine ratio explained her rationale in a sentencing memorandum in the case of *United States v. Noel Francisco Saldana*, Case No. 1:17-cr-00271-JTN. Kennedy refers to this memorandum in his brief, erroneously titling the case *United States v. Soldano*. *See* Appellant's Br., p. 50. The fact that another judge has disagreed with the Guidelines' methamphetamine ratio, however, remains irrelevant, as the district court here articulated its reasons for following the law as written, making findings that were reasonable under the law.

41

discretion and were instead reasonable under the circumstances. This Court should, therefore, uphold the district court's findings.

## CONCLUSION

For the foregoing reasons, the Court should affirm Kennedy's sentence.

Respectfully submitted,

MARK A. TOTTEN
United States Attorney

Dated: November 15, 2022        /s/*Stephanie M. Carowan*
STEPHANIE M. CAROWAN
Assistant United States Attorney
P.O. Box 208
Grand Rapids, Michigan 49501-0208
(616) 456-2404

42

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 15, 2022, the foregoing document was electronically filed.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's system.

I further certify that a copy of the foregoing document was mailed on this date to the opposing party if he/she was not registered to receive the document by the Court's electronic filing system.

/s/  *Stephanie M. Carowan*
STEPHANIE M. CAROWAN
United States Attorney's Office
Post Office Box 208
Grand Rapids, MI  49501-0208
(616) 456-2404

43

## CERTIFICATE OF COMPLIANCE

Pursuant to Rules 32(a)(7) and (g) of the Federal Rules of Appellate Procedure, the undersigned certifies that this brief complies with the type-volume limitation and contains no more than 13,000 words as provided by Rule 32(a)(7)(B).  A word count was made using Word and the brief contains 7,492 words.

MARK A. TOTTEN
United States Attorney

Dated: November 15, 2022    /s/   *Stephanie M. Carowan*
STEPHANIE M. CAROWAN
Assistant United States Attorney
P.O. Box 208
Grand Rapids, Michigan 49501-0208
(616) 456-2404

## DESIGNATION OF DISTRICT COURT DOCUMENTS

| Description of Entry | Date | Record Entry Number | Page ID Number Range |
|---|---|---|---|
| Docket Sheet 1:21-cr-37, WDMI | NA | NA | |
| Indictment | 02/24/21 | 18 | 43-46 |
| Plea Agreement | 06/21/21 | 38 | 170-179 |
| Final Presentence Report | 10/28/21 | 49 | 226-259 |
| Defendant's Sentencing Mem. | 11/02/21 | 51 | 309-320 |
| Judgment | 11/15/21 | 58 | 339-345 |
| Government's Sentencing Mem. | 11/15/21 | 61 | 351-368 |
| Ex. 1 – Gov't Sentencing Mem. | 11/15/21 | 61-1 | 369-379 |
| Ex. 2 – Gov't Sentencing Mem. | 11/15/21 | 61-2 | 380-386 |
| Ex. 3 – Gov't Sentencing Mem. | 11/15/21 | 61-3 | 387-393 |
| Ex. 4 – Gov't Sentencing Mem. | 11/15/21 | 61-4 | 394-395 |
| Ex. 5 – Gov't Sentencing Mem. | 11/15/21 | 61-5 | 396 |
| Ex. 6 – Gov't Sentencing Mem. | 11/15/21 | 61-6 | 397 |
| Notice of Appeal | 11/17/21 | 62 | 398 |
| Sentencing Tr. Of 11/8/21 | 2/10/22 | 67 | 438-491 |
| Ex. 1 – Mtn. to Supp. Record | 04/07/22 | 68-1 | 495-500 |
| Ex. 2 – Mtn. to Supp. Record | 04/07/22 | 68-2 | 501-502 |
| Ex. 1 – 2nd Mtn. to Supp. Record | 07/26/22 | 70-1 | 507 |